IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 07-20710-CIV-JORDAN

GABINA MALDONADO, as Personal
Representative of the Estate of Alvin
Maldonado,

        Plaintiff,

vs.

THE FIRST LIBERTY INSURANCE
CORPORATION,

        Defendant.
_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    The Plaintiff, GABINA MALDONADO, as Personal Representative of the Estate of ALVIN MALDONADO, pursuant for Federal Rule of Civil Procedure 56 moves for summary judgment against the Defendant, THE FIRST LIBERTY INSURANCE CORPORATION [hereinafter "First Liberty"].

### INTRODUCTION

    1.    This is a bad faith action resulting from the tragic death of Alvin Maldonado, a husband and father of three children. Mr. Maldonado died as a result of an automobile accident with Julia Clinche, who carried a $25,000 liability policy with the Defendant, First Liberty. After settlement negotiations failed, as detailed below, suit was filed and a judgment was entered against Julia Clinche and her husband, Carlos Clinche, for $3 million. This bad faith suit ensued. For the reasons set forth below, the Plaintiff believes she is

entitled to summary judgment on the issue of the Defendant's bad faith handling of the insurance claim.

## APPLICABLE LAW

2.    The insurance contract that is the subject of this matter was entered into in Florida, and, as a result, Florida law applies. *See Pastor v. Union Central Life Ins. Co.*, 184 F.Supp.2d 1301 (S.D.Fla. 2002). The grandfather of bad faith decisions in Florida is *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980), wherein the Court stated:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise of the probable outcome of litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same.

*Id.* at 785 (citations omitted). Relevant to this Motion is the insurer's **duty to advise its insured of any steps that might be taken to avoid an excess judgment.**

## UNDISPUTED FACTS

3.    All of the relevant facts set forth below are taken in the light most favorable to First Liberty, the non-moving party.

4.    This tragic accident occurred on January 4, 2004. Within one month of the accident, First Liberty accepted liability on behalf of Julia and Carlos Clinche. (Depo. Brigitte Klein p. 76.) On January 28, 2004, the attorney for the family of the deceased demanded the Clinches' $25,000 policy limits along with an affidavit setting forth the

Clinches assets, if any. (Depo. Klein pp. 68-69.) First Liberty then forwarded to its insureds a standard form affidavit that only said the insured had no other insurance coverage for this accident and had "no assets that would be available to satisfy any claims." (Depo. Klein pp. 71-73.) Upon receipt of these affidavits (one each for Mr. and Mrs. Clinche), the Maldonados' attorney, Barry Snyder, did not believe that these affidavits were sufficient. In his opinion, the term "no assets that would be available to satisfy any claims" called for a legal conclusion and did not state what, if any, assets the Clinches had. (Depo. Snyder p. 25.)

5. Mr. Snyder then forwarded a more-detailed affidavit to First Liberty for the Clinches to fill out. Brigitte Klein, the First Liberty claim adjustor assigned to this claim, forwarded this affidavit to the Clinches. Ms. Klein testified that requesting an insured to fill out an affidavit like this was not uncommon, and she even agreed that it would be malpractice for a plaintiff's attorney to not request a detailed affidavit. (Depo. Klein p. 70.)

6. Upon receipt of the affidavit, Mr. Clinche became concerned about revealing confidential information, mainly his social security number and bank account numbers, because of identity theft. (Depo. Carlos Clinche p. 12.) Ms. Klein confirmed that this was the concern. (Depo. Klein p. 115.) She then notified Mr. Snyder that the Clinches "will not complete the affidavits with personal information requested at this time." (Exhibit 1; Bates No. LM 0162.) While Ms. Klein did ask Mr. Snyder if he was willing to amend the affidavit, she never told Mr. Snyder that Mr. Clinche only had a problem with revealing social security and bank account numbers. (Depo. Snyder pp. 49 & 53.) As a result, on July 13, 2004, Mr.

Snyder notified Frist Liberty that his clients refused to the settle the case for $25,000. (Exhibit 2; Bates No. LM 0378.)

7. During the more than five months when the Maldonado's offered to settle the case for the policy limits if a more-detailed affidavit of assets was signed, Ms. Klein never attempted to take any more steps in order to arrive at a solution over the Clinches' concern regarding providing confidential information in the affidavit:

> Q. What about any conversations with, for example, other options of getting that information for the plaintiff so that you could settle the case and relieve the [Clinches] for any personal exposure, such as a sworn statement and agreement with the plaintiff's attorney that it would remain confidential, it would be given back to the [Clinches] after the settlement was consummated, any options like that ever discussed?
>
> A. No.

(Depo. Klein p. 97)

8. Only after the case failed to settle for the policy limits – and the plaintiff's offer was raised to $1 million – did Ms. Klein offer to have someone go out to the Clinches' home to pick up the affidavit in an apparent attempt to address a concern over placing the Clinches' personal information in the mail. (Depo. Klein p. 113.) Ms. Klein then testified that perhaps the Clinches would be more comfortable providing their asset information under oath <u>after suit was filed</u>.[1] (Depo. Klein pp. 116-117.)

9. In addition to his concern over providing confidential information, Mr. Clinche was also concerned about his home and his mother's home, which, as Ms. Klein

---

[1] Ms. Klein testified that anytime during the claims period she could have called inhouse our outside counsel for advice. (Depo. pp. 22-23.) However, she did not call counsel regarding her handling of the negotiations until after suit was filed. (Depo. p. 117.)

testified, "he was on paper for." (Depo. Klein p. 77.) When the Clinches refused to sign the more-detailed affidavits, Ms. Klein also told Mr. Clinche that, if the case did not settle, a judgment could be entered against him and that "he would have to make good on the judgment." (Depo. Klein p. 99.) During her deposition, the following dialogue occurred:

> Q. ... Did you explain to him ... that the judgment would be recorded in the courthouse, formally recorded, words to that effect, what the process would be, did you explain hat to him?
>
> A. No.
>
> Q. Did you explain to him the impact of having a recorded judgment on his credit as it might related to buying a house, buying a car or ... anything else he might want to buy where credit would be an issue?
>
> A. No.
>
> Q. Did you explain any other details about the impact of a judgment, you know, on whatever he might do, getting a job or whatever, filling out an application for a job at all?
>
> A. No.
>
> **Q. Did you feel it would be in his best interest to know that before he finally refused not to sign the affidavit?**
>
> **A. Yes.**

(Depo. Klein pp. 100-101; emphasis added.)

10. Mr. Clinche testified that he did have any experience or understanding of the consequences of a judgment or bankruptcy. Instead of providing him with an explanation or an attorney to assist him, Mr. Clinche said that First Liberty "told me that I only get an attorney when I get sued." Once suit was filed, and First Liberty provided an attorney to defend the suit, Mr. Clinche agreed to a $3 million judgment. He then filed for bankruptcy as a result of this judgment. (Depo. Clinche pp. 5-8.)

## ARGUMENT

11.     Under Florida law, an insurance company is obligated "to advise the insured of settlement opportunities, to advise of the probable outcome of litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Gutierrez*, supra.  During the course of negotiations between First Liberty and Mr. Snyder, the only hurdle to settlement for the policy limits was the affidavit that Mr. Snyder asked the Clinches to fill out.  Stated otherwise, the only step that needed to be taken to reach a settlement – and avoid an excess judgment – was to provide the plaintiff with the information requested in the affidavit.

12.     First Liberty, through its claims agent, knew that the Clinches were concerned about providing their social security and bank account numbers without a guarantee of confidentiality.  First Liberty had more than five months to the steps necessary to address this issue and resolve the case for the policy limits.  But First Liberty did nothing until the time demand for settling within the policy limits expired.  Only after that, when the Plaintiff's demand was at $1 million, did First Liberty offer to send someone out to the Clinches house so they did not have to put their personal information in the mail.  Instead of immediately suggesting a sworn statement of the Clinches regarding their assets, First Liberty decided they would wait until after a lawsuit was filed.  Both of these alternatives – along with numerous others – could have been provided to Mr. Clinche and Mr. Snyder while the case could have settled for the policy limits.

13.     It is undisputed that First Liberty failed to advise Mr. Clinche of the steps that might be taken to avoid an excess judgment.  Instead, First Liberty only provided Mr.

Clinche with various options <u>after</u> the plaintiff's demand for the policy limits expired. Mr. Clinche testified that if he was presented with a way to provide his asset information that addressed his concerns about identity theft, then he "probably" would have agreed to that option. (Depo. Clinche p. 17.) But Mr. Clinche was never given any options during the time period when the case could have settled for the policy limits.

14. First Liberty also failed to adequately advise the Clinches of the probable outcome of litigation and to warn them of the possibility of an excess judgment. Ms. Klein admitted that she only told the Clinches that if they did not sign the affidavits and the case did not settle, judgment could be entered against them and "they would have to make good on the judgment." This is despite the fact that she normally would explain to First Liberty's insureds what a judgment means and that an excess judgment could effect their credit. She agreed that it would be in an insured's best interest to know that a judgment would be recorded, that their credit would be impacted, and they would have to reveal a judgment on a job application. But she did not do any of this. Instead, she told the Clinches to go get their own counsel.

15. In Florida, an insurer owes a duty to the insured to exercise the utmost good faith in order to protect the interests of the insured. *Baxter v. Royal Indemnity Co.*, 285 So. 2d 652 (Fla. 1974). Insurers have a duty to protect insureds and settle claims when under all of the circumstances it could and should have done so had it acted fairly and honestly toward its insured and with due regard for the insured's interests. *Gutierriez,* supra. First Liberty failed to act fairly and honestly to the Clinches when Ms. Klein admits that it would be important for the Clinches to know the impact of an excess judgment, but fails to tell

them. Likewise, First Liberty did not act in the best interest of its insureds when it only attempts to get the case resolved – by addressing the Clinches concerns regarding the affidavit – after the case as failed to settle for the policy limits.

16. There is no question of fact that First Liberty failed to meet its good faith obligations under Florida law. Ms. Klein admits that she did not fully advise the Clinches of all steps they could have taken to avoid an excess judgment. Neither did she fully advise and warn them of the probably outcome of litigation and the possibility of an excess judgment. There is no genuine issue of material fact on these issues. As a result, the Plaintiff is entitled to judgment as a matter of law.

WHEREFORE, Plaintiff, GABINA MALDONADO, as Personal Representative of the Estate of ALVIN MALDONADO, respectfully requests this Court to enter Summary Judgment against the Defendant, THE FIRST LIBERTY INSURANCE CORPORATION.

Respectfully submitted,

BY:   s/*Andrew Moss*
Andrew M. Moss
Florida Bar No. 0170259
Email: moss@krblaw.net
KUTNER, RUBINOFF & MOSS, P.A.
P.O. Box 9700
Miami, FL  33101-9700
Phone: (305) 358-6200
Fax:    (305) 577-8230
Attorney for Plaintiff.

### CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that that the foregoing

document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the matter specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

BY:   s/*Andrew Moss*
Andrew M. Moss
Florida Bar No. 0170259
Email: moss@krblaw.net
KUTNER, RUBINOFF & MOSS, P.A.
P.O. Box 9700
Miami, FL 33101-9700
Phone: (305) 358-6200
Fax: (305) 577-8230
Attorney for Plaintiff.

## SERVICE LIST

Mark Shapiro, Esq.
Gary Guzzi, Esq.
Akerman Senterfitt
One SE 3rd Ave.
28th Floor
Miami, FL 33131

# Exhibit 1



The First Liberty Insurance Corporation
PO Box 407013

Fort Lauderdale FL  33340
Tel:  (954) 771-2155  /  (800) 275-4103
Fax: (954) 491-4819

May 26, 2004

SNYDER & GONZALEZ, P.A.
1558 NE 162 STREET, SUITE A.
NORTH MIAMI BEACH FL  33162

INSURED:        CARLOS CLINCHE
CLAIMANT:       ALVIN MALDONADO
DATE OF LOSS:   01/05/2004
CLAIM NUMBER:   LA518-004234092-03

Dear Mr Snyder:

I have been in contact with our insured, and he has confirmed receipt of the affidavits requested by your office.

Our insured finds these affidavits very invasive in their request of extremely personal financial information, which has nothing to do with any assets.  If you are willing to amend the affidavit in a way to address only the issues of personal assets, we will be happy to forward this on to our insured.  Our insured will not complete the affidavits with personal information requested at this time.

We still stand ready to resolve this claim with prior signed affidavit and the $25,000 policy limit offered in resolution.

Sincerely,
BRIGITTE KLEIN
Claims Department
Ext.  358

Helping People Live Safer, More Secure Lives

FREEFRM

LM 0162

Exhibit 2

# SNYDER & GONZALEZ, P.A.
## ATTORNEYS AT LAW

BARRY M. SNYDER • ••
VICTOR M. GONZALEZ‡
JULIO E. MUÑOZ

1558 NE 162 Street, Suite A
North Miami Beach, Florida 33162

BOARD CERTIFIED CIVIL TRIAL LAWYER •
CERTIFIED CIVIL MEDIATOR ••
ADMITTED TO THE SUPREME COURT OF THE UNITED STATES‡

MIAMI-DADE:
(305) 919-9797
TOLL FREE:
(800) 400-3144
FACSIMILE:
(305) 948-6571

www.barrymsnyder.com

July 13, 2004

**VIA REGULAR MAIL
and FACSIMILE 954.491.4819**

Brigitte Klein
Liberty Mutual
P.O. Box 407013
Ft. Lauderdale, FL 33340

Re: Our Clients:    The Estate of Alvin Maldonado, and all survivors
    Your Insureds:  Carlos Clinche and Julia Clinche
    D/Accident:     01/05/2004
    Claim#:         4234092-03
    Our File#:      041014

Dear Ms. Kline,

Be advised that since you and your insured failed to complete our financial affidavits we hereby withdraw our offer to settle for policy limits. Accordingly your voided check is enclosed.

At this time please inform your insureds that our new demand is $1,000,000.00 which must be tendered within seven (7) days of this letter. Failure to tendered the $1,000,000.00 within the seven (7) business days will result in a lawsuit being filed.

Finally, should Liberty Mutual wish to avoid a bad faith claim, the $25,000 should be tendered within seven (7) business days, *without any* conditions and without any prejudice to our clients, other than Liberty Mutual's entitlement to a setoff against a verdict.

*Please provide your insureds with a copy of this letter.*

Very truly yours,

BARRY M. SNYDER, ESQ.
BMS:mq
Encl.

LM 0378