## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 07-20710-CIV-JORDAN

GABINA MALDONADO, as
Personal Representative of the Estate of
Alvin Maldonado,

      Plaintiff,

vs.

THE FIRST LIBERTY
INSURANCE CORPORATION,

      Defendant.

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, The First Liberty Insurance Corporation ("First Liberty"), by and through its undersigned counsel, hereby moves for entry of summary judgment in its favor and responds in opposition to Plaintiff's Motion for Summary Judgment [D.E. 33].  First Liberty is entitled to summary judgment because Florida law does not recognize the duty that Plaintiff claims First Liberty breached and because First Liberty's insured, Carlos and Julia Clinche, not First Liberty, controlled whether the Plaintiff's settlement offer to the Clinches could be accepted.  It was the Clinches, not First Liberty, who failed to satisfy a condition to settlement, thereby precluding the settlement and a release for the Clinches.  As a result, as a matter of law, summary judgment should be entered in favor of First Liberty

### INTRODUCTION

Plaintiff is the estate of an individual who was killed as a result of an automobile accident caused by First Liberty's insured, Julia Clinche.  After the accident, Plaintiff offered to settle its

CASE NO.:  07-20710

claim against the insureds in exchange for the limits of the Clinches' policy limits, provided that

the insureds were submit an affidavit establishing the extent of their assets and other insurance.

First Liberty agreed to tender the insureds' $25,000 policy limits and the insureds completed and

submitted an affidavit with regard to their assets.   Plaintiff, however, decided the affidavit was

not sufficiently detailed.   Plaintiff then insisted upon the insureds completing a significantly

more detailed affidavit, which the insureds refused to complete, despite First Liberty's repeated

communications to the insureds regarding the effect of their refusal to complete the detailed

affidavits.  Because the insureds refused to complete the detailed affidavits, Plaintiff's claim was

not settled, and litigation was commenced.   That litigation resulted in a $3 million consent

judgment being entered against the insureds.  Plaintiff then filed the instant lawsuit, alleging that

First Liberty acted in bad faith with respect to the manner in which it handled Plaintiff's claim

against First Liberty's insureds.

Plaintiff's cause of action for bad faith, however, must fail because First Liberty acted in

accordance with Florida law.  Plaintiff apparently believes that First Liberty did not comply with

its claim handling responsibilities, despite the fact that First Liberty attempted to settle the claim

within policy limits, promptly communicated with its insureds regarding settlement

opportunities, continually advised its insured as to all conditions to settlement and the steps

necessary to comply with Plaintiff's settlement demands, and acted in accordance with all

requirements set forth under Florida law regarding settlement of Plaintiff's claim.  The reason

that Plaintiff's claim was not settled was not because of First Liberty's improper handling of the

claim.  Rather, the claim was not settled because the insureds refused to complete the detailed

affidavits that were a condition to settlement and Plaintiff.  First Liberty cannot be held liable for

bad faith where it fulfilled its good faith obligations and the claim did not settle within policy

CASE NO.:  07-20710

limits due to the insured's refusal to comply with the conditions of the settlement opportunity afforded to them.

In the end, although the automobile accident resulted in a tragic death, this case involves a Plaintiff attempting to expand and re-write Florida bad faith law to create a cause of action where none exists.  First Liberty did everything that was under its control to comply with Plaintiff's settlement demands, but the insureds did not perform the acts necessary to achieve a settlement, acts which only the insureds (not First Liberty) could have performed.  First Liberty cannot be held liable for bad faith arising from actions that are <u>not</u> within its control.  Indeed, Plaintiff seeks to impose new duties upon First Liberty, such as a duty to advise its insured as to the details of each and every legal and practical ramification of an excess judgment being entered against them, as well as a duty to play mediator between an insured and a claimant where those parties refuse to back down from positions that will not result in settlement.  In seeking to impose such duties, however, Plaintiff does not (and cannot) point to a single Florida case that would result in such imposition.   Simply put, there is no need to proceed to a jury because there is no legal requirement to perform the duties that Plaintiff asserts constitutes bad faith.[1] Accordingly, First Liberty is entitled to summary judgment in its favor.

## <u>STATEMENT OF UNDISPUTED FACTS</u>

1.      At all relevant times, Carlos Clinche and his wife, Julia (Rolffot) Clinche were insured under a First Liberty automobile insurance policy.   The policy provided, <u>inter alia</u>, coverage for bodily injury to others with limits of $25,000 per person and $50,000 per accident. A copy of the policy is attached hereto as Exhibit A.

---

[1] The same does not hold true with respect to Plaintiff's Motion for Summary Judgment.  For Plaintiff to succeed on its motion, Plaintiff needs to establish both that the duties it seeks to impose are actually required by Florida law, and that First Liberty acted in bad faith by failing to fulfill those duties.  Even if Plaintiff's argument regarding imposition of new duties were successful (which it is not), the case would need to proceed to a jury to determine the factual question regarding whether First Liberty acted in bad faith.

CASE NO.:  07-20710

2.      On January 5, 2004, while driving her husband's automobile, Ms. Clinche was involved in an accident.  As a result of the accident, Alvin Maldonado was killed.

3.      On January 6, 2004, the day after the accident occurred, Mr. Clinche reported the accident to First Liberty.  Upon commencement of the claim, First Liberty created computerized claim notes that record some of the activity that occurred in the file.  A copy of the relevant portions of the computer notes is attached hereto as Exhibit B.[2]

4.      When Mr. Clinche reported the accident, he was not able to provide many details about the accident but did report that the accident resulted in a fatality.  First Liberty forwarded an excess judgment letter to Mr. Clinche that same day.  A copy of the January 6, 2004 letter to the insureds is attached hereto as Exhibit C.

5.      On January 8, 2006, First Liberty spoke with Mr. Clinche again.  Mr. Clinche advised that he had already spoken with someone from First Liberty, that he would not repeat himself, and that his wife was in a daze and could not recall what had occurred.  First Liberty advised Mr. Clinche that it needed to speak with his wife, that it needed their cooperation and that it was attempting to protect them.  First Liberty sent a letter to Mr. Clinche the same day, asking for their cooperation.  A copy of this letter is attached hereto as Exhibit D.  The same day, First Liberty was also able to speak with the Miami-Dade police department and obtain some additional information regarding the accident.

6.      On January 16, 2004, First Liberty received a call from an attorney, Barry Snyder, who indicated that he was acting on behalf of Mr. Maldonado's estate but had not yet been officially retained.  First Liberty subsequently received a letter dated January 23, 2004 from Mr. Snyder's office, indicating that they had been retained and were requesting photos of the

---

[2] To read chronologically, the claim notes must be read from bottom to top, and from back to front.

CASE NO.:  07-20710

accident scene and the policy disclosures required under Fla. Stat. § 627.4137.  A copy of this letter is attached hereto as Exhibit E.

7.     On January 28, 2004, upon receipt of the attorney representation letter, Dan Scarborough of First Liberty spoke with Mr. Snyder.  Mr. Snyder advised Mr. Scarborough of some background information regarding the decedent (married with three minor children), informed First Liberty that the UM/UIM carrier had already tendered the $100,000 policy limits, and advised that he was looking for the full policy limits plus an asset affidavit from the insureds and that he was in the process of setting up an estate for the deceased.  Notably, although an asset affidavit from the insureds was a condition of any potential settlement, Mr. Snyder did not forward a specific form for the requested affidavit or provide any details as to the scope of the information that he was requesting.  See Deposition of Barry Snyder, attached hereto as Exhibit F, at 19-22; Claims Notes (Exhibit B hereto) at page 18 of 22, entries dated 1/28/04 at 5:39 p.m. and 5:42 p.m.

8.     The following day, January 29, 2004, Mr. Scarborough forwarded a letter to Attorney Snyder, a copy of which is attached hereto as Composite Exhibit G.  In the letter, First Liberty enclosed a copy of the policy's declarations page and advised that there were no known excess policies and that First Liberty had requested a certified copy of the policy.  The letter also indicated that First Liberty was offering the policy's $25,000 limit and enclosed a release.  The letter confirmed that Mr. Snyder would be setting up the estate of the deceased and requested that Mr. Snyder advise when the estate had been opened and when he would like the settlement check to be forwarded.  The letter also advised that First Liberty had forwarded asset affidavits to its insureds and would forward it to Mr. Snyder once First Liberty had received the completed affidavits.

CASE NO.:  07-20710

9.     Also on January 29, 2004, First Liberty forwarded a letter to Mr. and Mrs. Clinche, a copy of which is attached hereto as Exhibit H.  The letter advised the insureds that First Liberty had offered the $25,000 policy limits in full settlement of the estate's claim, that the estate's attorney had requested asset affidavits (which were enclosed), that only the insureds (and not First Liberty) could provide the affidavits, that the estate likely would not settle without receiving the completed affidavits, that the insureds were free to speak with their own attorneys about the settlement offer, and advised as to the legal effect and benefit of obtaining a release. Because Mr. Snyder had not provided a specific affidavit for the insureds to complete or provided First Liberty with the specific information to be contained in an affidavit, First Liberty forwarded to the insureds its own version of an asset affidavit.  A blank copy of the affidavit is attached hereto as Exhibit I.

10.     On February 4, 2004, Mr. Clinche called First Liberty inquiring as to the settlement offer and the affidavit and spoke with Brigitte Klein, the adjuster assigned to the claim.  Ms. Klein explained to Mr. Clinche that the claimant's attorney was attempting to determine if the Clinches had any assets that could satisfy any judgment that might be entered against them, and explained the reason why the claimant was requesting such information. During the conversation, Mr. Clinche also asked about the effect on his own house and commented that his name was listed on his mother's house.  Ms. Klein advised Mr. Clinche that he needed to speak with his own personal attorney about such issues.  See Deposition of Brigitte Klein, attached hereto as Exhibit J, at 77-81; Claims Notes (Exhibit B hereto) at page 17 of 22, entry dated 2/4/2004.

11.     On February 11, 2004, after receiving the completed asset affidavits from Mr. and Mrs. Clinche, Ms. Klein forwarded the affidavits to Attorney Snyder, along with a certified copy

CASE NO.:  07-20710

of the policy.  Copies of the cover letter and the completed affidavits are attached hereto as Exhibit K.

12.    On May 17, 2004, over three months after the original affidavits were forwarded to Attorney Snyder, First Liberty for the first time received a response.  On that date, it received a letter dated May 14, 2004 from Mr. Snyder, indicating that the original affidavits that the Clinches had completed were insufficient because they did not address all of the insureds' assets. The letter enclosed more detailed affidavits and requested that the affidavits be completed by the Clinches and returned within ten days.  A copy of the May 14 letter is attached hereto as Exhibit L.  Blank copies of the revised affidavits are attached hereto as Exhibit M.

13.    On May 17, 2004 (the same day that First Liberty received the May 14 letter), First Liberty forwarded the May 14 letter to the insureds, along with the revised affidavits.  In its cover letter, First Liberty explained that the estate's attorney had rejected the earlier affidavits, explained the terms of the current settlement demand, and again advised that the estate likely would not settle without the revised affidavits.  A copy of the cover letter is attached hereto as Exhibit N.

14.    On May 26, 2004, Ms. Klein called the insureds to follow up on the status of the affidavits.  Mr. Clinche advised Ms. Klein that they had received the affidavits but that they refused to complete them because they contained information that they believed was too personal, such as Social Security numbers and bank account numbers.  Ms. Klein advised Mr. Clinche that the claimant's attorney did not believe that the original affidavit was sufficiently detailed, and that the claimant likely would not settle the case within policy limits without the more detailed affidavit.  Nevertheless, Mr. Clinche advised Ms. Klein that they would not complete the detailed affidavits, and advised Ms. Klein that the claimant would need to rely upon

CASE NO.:  07-20710

the information contained in the affidavits that the Clinches had previously completed.  <u>See</u> Klein Depo. (Exhibit J hereto) at 92-93.  To ensure that there was no misunderstanding or miscommunication with respect to the insureds' position and their refusal to complete the affidavits, Ms. Klein advised Mr. Clinche that she would send a letter confirming their conversation, and in fact did so.  A copy of this confirming letter is attached hereto as Exhibit O. At his deposition, Mr. Clinche confirmed that Ms. Klein's letter was a completely accurate recitation of their conversation and his position, and that he was not willing to complete the detailed affidavits or any part of it.  <u>See</u> Deposition of Carlos Clinche, attached hereto as Exhibit P, at  27-33.

15. Also on May 26, 2004, First Liberty sent a letter to Attorney Snyder, advising him that the insureds had received the revised affidavits but that the insureds refused to complete them because they found the affidavits too invasive.  Specifically, First Liberty's letter stated that:

> our insured finds these affidavits very invasive in their request of extremely personal financial information, which has nothing to do with any assets.  If you are willing to amend the affidavit in a way to address only the issues of personal assets, we will be happy to forward this on to our insured.  Our insured will not complete the affidavits with personal information requested at this time.

The letter also advised that First Liberty was still ready and willing to settle the case for payment of $25,000 if the estate was willing to accept the original version of the affidavit.  A copy of this letter is attached hereto as Exhibit Q.

CASE NO.:  07-20710

16.     In response, on June 17, 2004, First Liberty received a letter dated June 16, 2004 from Mr. Snyder, which stated as follows:

> It is unfortunate that your clients have chosen to not answer the financial affidavits mailed May 14, 2004.  You did not specify which part(s) of the affidavits you believe to be improper and your clients did not even answer the items which they did not object to. **Upon further review of the affidavits, we find every request reasonable under the circumstances.  It is your responsibility to convey this message to your insureds and to make the recommendation to fully and accurately complete the affidavits.**  Failure to do so will expose your company to bad faith damages.  **If your insureds still refuse to answer and execute the affidavits, then your company should tender the policy limits without obtaining a release due to your insureds failure to follow your instructions.**  If it is your company that has instructed your clients not to complete the affidavits, then your company will be held responsible for your bad faith conduct when a jury awards an amount far in excess of their policy limits.  (Emphasis added.)

A copy of the letter is attached hereto as Exhibit R.  As noted in the letter, rather than respond to First Liberty's invitation to forward an amended affidavit to address the insureds' concerns, Plaintiff reiterated the requirement that the insureds complete the detailed affidavits before Plaintiff would consider settling within the policy limits.  The letter makes clear that Plaintiff's position was simple – the insureds must fully and accurately complete the affidavits if they wanted Plaintiff to consider settlement for policy limits in exchange for a release.

17.     In an effort to comply with the portion of Plaintiff's settlement demand that was under First Liberty's control (i.e., payment of the policy limits), First Liberty sent a letter to Attorney Snyder, advising that a check for the policy limits had been mailed under separate cover and enclosing a release of the insureds.  A copy of this letter is attached hereto as Exhibit S.  First Liberty also sent a letter to the insureds the same day, enclosing Attorney Snyder's letter dated June 16, 2004, advising that First Liberty had issued a check for $25,000 but that a release from the estate was necessary before the check could be accepted, and confirming that First

Liberty had previously explained to the insureds the ramifications of the insureds not submitting the affidavits.  A copy of this letter is attached hereto as Exhibit T.  Despite First Liberty's repeated communications with the insureds regarding settlement conditions and the ramifications of not completing the affidavits, the insureds still did not complete the affidavits.

18.     On July 13, 2004, Attorney Snyder wrote a letter to First Liberty advising that because First Liberty and its insureds had failed to complete the requested affidavits, the estate was withdrawing its offer to settle for policy limits and returning the voided settlement check. The letter also instructed First Liberty to advise its insureds that the settlement demand was now $1 million and that such amount must be tendered within 7 days or else a lawsuit would be filed. A copy of this letter is attached hereto as Exhibit U.

19.     Upon receipt of the July 13, 2004 letter, First Liberty wrote a letter to the Clinches dated July 16, 2004, enclosing the July 13 letter.  In its cover letter, First Liberty advised its insureds that the estate no longer was willing to settle for the policy limits because the insureds had refused to submit the affidavits and that the new demand was $1 million with a seven day limit.  The letter once again enclosed the requested affidavits in case the estate was willing to accept the policy limits with the revised affidavits.  The letter advised that First Liberty would continue to offer the $25,000 policy limits for a release, but that it was unlikely the estate would accept that as settlement.  The letter requested the insureds to provide the completed affidavits and/or instructions on how they wished for First Liberty to proceed by noon on July 20 (as the offer expired on July 22), and advised the insureds that, because of the seriousness of the claim, they may wish to consult with a personal attorney.  A copy of this letter is attached hereto as Exhibit V.

20.     Also on July 16, 2004, Ms. Klein spoke with Mr. Clinche regarding the estate's letter and settlement demand.  Ms. Klein advised Mr. Clinche that the insureds may wish to reconsider their refusal to submit the affidavits.  Mr. Clinche responded that the estate "can't get blood from a turnip," that he does not have $1 million so he could not do anything regarding what the estate was looking for, and that he still refused to give out the detailed information that Plaintiff was seeking.  Ms. Klein once again advised Mr. Clinche that he may wish to consult a personal attorney to ensure that he was protecting himself.  See Clinche Depo. (Exhibit P hereto) at 35-38; Claim Notes (Exhibit B hereto) at page 14 of 22, undated entry at top of page.[3]

21.     On July 20, 2004, in the event that Plaintiff would re-consider settlement of the claim within policy limits, First Liberty again forwarded a check in the amount of the $25,000 policy limits to the estate's attorney along with a release.  A copy of this letter is attached hereto as Exhibit W.

22.     On July 21, 2004, First Liberty forwarded a letter to its insureds, confirming that in the July 16 conversation, the insureds did not want to complete the revised affidavits, that the estate cannot get blood from a stone, and that First Liberty again was forwarding a check for the $25,000 policy limits along with a release to the estate's attorney but that it likely would not be accepted.  The letter also asked the insureds to advise if they were willing to reconsider submitting the affidavits.  A copy of this letter is attached hereto as Exhibit X.

23.     On July 29, 2004, Attorney Snyder's office sent a letter to First Liberty advising that the estate was unable to accept the check because it was conditioned upon execution of a release, and for First Liberty not to send a check again if it expected the estate to execute a release.  A copy of this letter is attached hereto as Exhibit Y.

---

[3] As explained during Ms. Klein's deposition, because of the way that this page was printed out from First Liberty's computer system, the date and time of the entry was cut off.  This entry was dated July 16, 2004 at 10:27 a.m., and was entered by Ms. Klein.

CASE NO.:  07-20710

24.    On August 3, 2004, First Liberty called Mr. Clinche in yet another effort to discuss settlement of the claim and even offered to pick up the affidavit if he had changed his mind about completing it.   Mr. Clinche responded by stating that he knew that the estate's attorney was "just playing games" and the attorney knew that he could not get anything from the insureds.   In addition, the insured advised that his previous comment was that "you can't get orange juice from a grape" (as opposed to "you can't get blood from a stone"), but that he stood by his position that there was nothing to get from the insured and that the affidavit was only for private information that was not needed by the estate.   See Clinche Depo. (Exhibit P hereto) at 38-40; Claims Notes (Exhibit B hereto) at page 13 of 22, entry dated 8/3/2004.

25.    On August 11, 2004, the estate's attorney returned the tendered settlement check and advised that a lawsuit would be filed.   Plaintiff eventually filed a lawsuit against the Clinches, which lawsuit resulted in a consent judgment in the amount of $3 million.   First Liberty paid the $25,000 policy limits, leaving a remaining outstanding balance on the judgment of $2.975 million.   Copies of the settlement agreement among the parties and the consent judgment are attached hereto as Exhibit Z.

## ARGUMENT

## I.    GENERAL FLORIDA BAD FAITH LAW

Under Florida law, a carrier's overall duty in handling a claim is a duty of "utmost good faith and a reasonable discretion in evaluating the claim made against [the insured] and in negotiating for a settlement of that claim within the policy limits if such is possible."   Baxter v. Royal Indem. Co., 285 So. 2d 652, 655 (Fla. 1st DCA 1973).   The Florida Supreme Court's seminal bad-faith decision, Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla.

CASE NO.:  07-20710

1980), expounds upon this overall good faith duty and sets forth the specific scope of the good faith duties that an insurance carrier owes towards its insured.

> When the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.  This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same.  (Citations omitted).   The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

Id. at 785; see also Macola v. GEICO, 953 So. 2d 451 (Fla. 2006) (quoting Boston Old Colony). Florida law also requires that an insurer communicate promptly with its insured with respect to claims, and that it settle claims when, under the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests.  See Fla. Stat. § 624.155(1)(a), (1)(b).  An insurer's refusal to settle, in and of itself, is insufficient to establish that the insurer acted in bad faith, as long as an insurer acts honestly and in good faith. Liberty Mutual Ins. Co. v. Davis, 412 F.2d 475, 482-483 (5th Cir. 1969) (applying Florida law). Florida courts evaluate whether a carrier has acted in bad faith based on a review of the totality of the circumstances.  State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So. 2d 55, 63 (Fla. 1995).

The seminal bad faith decision in Florida, Boston Old Colony, directly relates to the issue at hand.  In Boston Old Colony, Brown and Gutierrez were involved in an automobile accident in which both believed that the other was responsible.  Each sued the other.  Boston Old Colony insured Brown and recognized that there was a question of liability and a substantial damage claim by Gutierrez against Brown.  Boston Old Colony warned Brown of these matters and

CASE NO.:  07-20710

suggested an offer to settle for the policy limits.  Brown was opposed to settlement in light of his

claim against Gutierrez and was concerned about the effect an offer to settle might have on his

claim against Gutierrez.  Before trial, Gutierrez offered to accept Brown's $10,000 in policy

limits which Boston Old Colony rejected.  Subsequently, Brown reached a settlement of his

claims against Gutierrez.  With that claim resolved, Boston Old Colony offered Gutierrez the

policy limits in settlement.  Gutierrez rejected that offer and proceeded to trial where he obtained

a judgment in his favor for $1,400,000.  Gutierrez then sued for bad faith, claiming that Boston

Old Colony had failed to settle the claim for policy limits when it had the opportunity.  Gutierrez

prevailed and obtained a judgment against Boston Old Colony for the excess judgment.

The Florida Supreme Court, after articulating the standard for bad faith in Florida,

reversed the jury verdict, and found that as a matter of law there was no evidence sufficient to

support the jury's finding of liability for bad faith in not settling the claim.  In reaching its

decision, the Court stated:

> The evidence presented in the present case demonstrates that Boston Old Colony fulfilled all these obligations… There is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer… In the present case, Brown, the insured, at all times contested liability and had evidence to support his position.  Brown expressly requested Boston Old Colony not to settle the claim because he was pursuing a counterclaim against Gutierrez… After settlement of Brown's counterclaim, prior to trial, Boston Old Colony offered to settle for policy limits.  Unlike Thompson, where the insurer refused to settle at all times despite advice of its own counsel, here the insurer was ready to settle, expressed its willingness to settle, and **only because of the explicit request of its own insured did not settle**.

Boston Old Colony, 386 So. 2d at 786 (emphasis added).  Based on this analysis, the Court

reversed the jury verdict of bad faith.

CASE NO.:  07-20710

More recent case law has also expanded upon the scope of a carrier's good faith duties. In <u>Contreras v. U.S. Security Ins. Co.</u>, 927 So. 2d 16 (Fla. 4th DCA 2006) a permissive user additional insured was driving the insured vehicle when the driver caused an accident that killed a pedestrian.  The carrier offered the policy limits in exchange for a release of both the driver and the owner.  The estate agreed to accept the full policy limits in exchange for a release of the owner of the vehicle, but not the driver.  The carrier refused to settle on those terms, arguing that because it owed duties to both insureds, it could not settle for policy limits by obtaining a release for one insured but not the other.  The court disagreed and explained a carrier's good faith obligations with respect to attempting to obtain a release.  According to the court, once a carrier has attempted to obtain a release for an insured but the victim refuses to provide a release, the carrier has fulfilled its good faith obligations towards that insured:

> Clearly, U.S. Security did have an obligation to act in good faith towards both of the insureds.  In an effort to fulfill its obligation of good faith, U.S. Security attempted to secure, in exchange for policy limits, a release for both [insureds].  Because of the gravity of [the driver's] misconduct, [the estate] was not willing to settle the claim against [the driver].  **Having attempted to secure a release for [the driver] without success, U.S. Security fulfilled its obligation of good faith towards [the driver].  Once it became clear that [the estate] was unwilling to settle with [the driver] and give him a complete release, U.S. Security had no further opportunity to give fair consideration to a reasonable settlement offer for [the driver].**  Since U.S. Security could not force [the estate] to settle and release [the driver], it did all it could do to avoid excess exposure to [the driver].

<u>Contreras</u>, 927 So. 2d at 21 (emphasis added).  Notably, given the claimant's indication that it would not settle with the insured driver within the policy limits, the court did not require the carrier to create an alternate settlement proposal in which the claim against the insured driver would have been settled or take any similar steps beyond accepting the claimant at face value that the claim against the driver would not be settled within policy limits.  <u>Id.</u>

CASE NO.:  07-20710

## II.   FIRST LIBERTY FULFILLED ALL OF ITS GOOD FAITH DUTIES RECOGNIZED UNDER FLORIDA LAW

As even Plaintiff will likely acknowledge, this case presents an unusual fact pattern for which there is no Florida case law that specifically addresses the factual scenario.  Typically, a carrier's bad faith is founded upon the carrier's refusal to tender the policy limits in exchange for a release or its failure to advise its insureds as to the terms of a settlement demand, see, e.g., Powell v. Prudential Prop. & Cas. Ins. Co., 584 So. 2d 12 (Fla. 3d DCA 1991).  In this case, however, none of these issues are present.  This is not a case in which the carrier failed to offer to settle for policy limits, as First Liberty almost immediately tendered its policy limits in exchange for a release of its insureds.  Nor is it a case in which a carrier failed to comply with a time-limit demand, as First Liberty responded to the claimant within any time limits set by the claimant.  Moreover, this is not a case in which the carrier failed to communicate with its insureds regarding settlement demands made by the claimant or failed to advise as to the possibility of an excess judgment, as First Liberty continually communicated with its insureds, by letter and by telephone, regarding all aspects of settlement.  Instead, as even Plaintiff must acknowledge, this case presents an unusual situation in which the claimant's settlement demand included a condition that could be satisfied only by the insured, a condition of which the insured was advised, but with which the insured refused to comply.

The question to be answered, then, is as follows: where a claimant conveys a settlement demand that is conditioned upon the completion of an asset affidavit by the insured, the claimant repeatedly insists upon completion the affidavit as a condition to settlement without ever dropping the condition as a requirement for settlement, the carrier promptly communicates the

CASE NO.:  07-20710

substance of the settlement demands to its insureds, the carrier advises its insureds of the likelihood of an excess judgment on several occasions, the carrier advises its insureds that the claimant likely will not settle without the completion of the affidavit, the insureds nevertheless (for whatever reason) refuse to complete the required affidavits, and the claim ultimately fails to settle because of the insured's refusal to complete the affidavits, should the carrier be held liable for bad faith?  The answer, of course, is a resounding "no."

When analyzed in the context of the good faith duties that are recognized and required under Florida law, there is no doubt that First Liberty complied with its good faith obligations in this matter.  The first duty required under Boston Old Colony is to advise the insured of settlement opportunities.  First Liberty continually advised the insureds of Plaintiff's settlement demands, both by telephone and by letter.  See, e.g., Exhibits B, H, N, O, T, V, X.  In these letters and telephone conversations, First Liberty advised the insureds that the Plaintiff was willing to consider settlement of the claim, provided that the insureds competed an asset affidavit.  First Liberty even forwarded copies of Plaintiff's settlement demand letters, so that the insureds had the opportunity to read for themselves the precise settlement terms and conditions. Accordingly, there is no doubt that First Liberty properly advised its insureds as to settlement opportunities.

The second and third duties required under Boston Old Colony are to advise as to the probable outcome of the litigation and to warn of the possibility of an excess judgment.  From the onset of the claim against the insureds, First Liberty continually advised the insureds as to the seriousness of the claim and the likelihood that the claim would result in an excess judgment. The very first letter that First Liberty sent to the insureds, dated January 6, 2004, advised the insureds that First Liberty's investigation into the matter indicated an exposure in excess of

policy limits.  See Exhibit C.    In numerous other letters and telephone conversations, First Liberty advised the insureds of the likelihood that an excess judgment would be entered if the claim was not settled.[4]  See Exhibits B, H, N, O, T, V, X.  The record is replete with numerous occasions in which First Liberty advised its insureds as to the probable outcome of the litigation and the possibility of an excess judgment.

The fourth duty under Boston Old Colony is to advise the insured as to any steps that the insured may take to avoid entry of an excess judgment.  As with the preceding duties, First Liberty complied with this duty.  At all times, Plaintiff insisted upon completion of an asset affidavit, in addition to payment of the policy limits, to settle the claim.  At all times, First Liberty advised the insureds precisely how they could avoid entry of an excess judgment – by completing the affidavits.  First Liberty advised the insureds in January and February 2004 when it forwarded the original affidavits and spoke with Mr. Clinche about completing the affidavits. In May 2004, when Plaintiff decided that the original affidavits were insufficient and requested that the insureds complete the more detailed affidavits, First Liberty again advised the insureds as to how they could avoid an excess judgment – by completing the more detailed affidavits. After the insureds initially refused to complete the affidavits and Plaintiff once again insisted upon completion of the detailed affidavits as part of any settlement, First Liberty once again

---

[4] Plaintiff certainly will agree that First Liberty repeatedly advised the insureds as to the likelihood of an excess judgment if the claim was not settled.  It is expected, however, that Plaintiff will argue that First Liberty did not comply with its obligations to advise the insureds as to the probable outcome of the litigation because it failed to advise the insureds as to the specific ramifications of an excess judgment, such as the effect on the insured's credit score, that a judgment may make it difficult for the insureds to obtain employment, etc.  Florida law, however, does not obligate a carrier to provide an insured with the specific legal and practical effects of a judgment (in part because accurate advice will depend on the specific financial considerations of each insured which is well beyond the scope and expertise of an insurance carrier or its contractual obligations to its insureds).  The law only requires a carrier to advise the insured that an excess judgment may be entered against them, which First Liberty indisputably did on multiple occasions.  First Liberty also advised the insured that they may wish to consult their personal attorney regarding the possibility of an excess judgment.  First Liberty is not required to act as the insured's financial advisor or personal attorney with respect to how an excess judgment may individually affect the insureds, and any failure to do so therefore cannot constitute bad faith.

CASE NO.:  07-20710

advised the insureds that they could avoid an excess judgment by completing the affidavits. Even after Plaintiff withdrew the settlement demand regarding asset affidavits, First Liberty advised that perhaps Plaintiff would still consider settling for the policy limits if the insureds were to complete the asset affidavits.  There simply is no doubt that First Liberty continuously and repeatedly advised the insured as to how they could avoid the excess judgment.[5]

With respect to the remaining duties set forth under <u>Boston Old Colony</u> and the bad faith statute (investigate the facts, communicate promptly with its insured with respect to claims, and settle claims when, under the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests), there is no doubt that First Liberty complied with these duties.  First Liberty commenced an investigation immediately upon being advised of the claim.  It quickly concluded that its own insured was at fault, and that damages resulting from the fatal accident would vastly exceed the insured's policy limits.  As a result, within just 23 days of the accident, First Liberty had already tendered its policy limits in an effort to settle the claim.  First Liberty was at all times ready, willing and able to tender the

---

[5] In its motion for summary judgment, Plaintiff essentially argues that the duty to advise the insured as to steps that the insured can take to avoid an excess judgment equates to a duty to act as a mediator/attorney/financial advisor. Plaintiff <u>repeatedly</u> insisted upon completion of <u>the entire</u> detailed affidavits before Plaintiff would consider settlement within policy limits, and <u>never</u> dropped completion of the asset affidavit as a condition to potential settlement within policy limits.  <u>See</u> Exhibits B, F, G, L, R, U.  Nevertheless, Plaintiff now attempts to backtrack from its own position and argue that even though completion of every portion of the asset affidavit was an explicit condition of potential settlement, and even though the insured repeatedly refused to complete the affidavits despite First Liberty's advice regarding the benefits of completing the affidavits and warning as to the likely result if the insureds did not complete the affidavit, First Liberty had a duty to mediate the parties' disagreement regarding the completion of the affidavits.  According to Plaintiff, even though both the insureds and Plaintiff had "drawn a line in the sand" regarding their refusals to back off of their respective positions, First Liberty should have ignored both sides' respective positions, assumed that both parties were misinformed or were lying, and then affirmatively created some type of settlement posture to which both sides would agree.  Florida law simply does not require any such duty.  Once a carrier advises its insured as to the terms of the settlement offer, the possibility of an excess judgment and the steps that the insured can take to avoid an excess judgment (such as by completing the asset affidavit that Plaintiff had demanded as part of any potential settlement in this case), the carrier has fulfilled its good faith obligations.  Neither <u>Boston Old Colony</u> nor <u>Contreras</u>, nor any other Florida bad faith case, requires a carrier to undertake such additional obligations in its claim handling.

policy limits in order to settle the case, but could not do so only because of the insured's unwillingness to complete the asset affidavits that were a condition of settlement.

This case is similar to the factual scenario in <u>Boston Old Colony</u>.  As explained above, in that case, the carrier was willing to settle for the policy limits, but the insured specifically instructed the carrier not to settle because the insured was concerned about a settlement offer's effect on the insured's counterclaim.  As noted by the Court, the carrier was not liable for bad faith as a matter of law because "here the insurer was ready to settle, expressed its willingness to settle, and only because of the explicit request of its own insured did not settle."  In the instant case, First Liberty was ready to settle and expressed its willingness to settle on numerous occasions, but it was the insured's own actions (the refusal to complete the asset affidavit) that caused the claim not to settle.  As <u>Boston Old Colony</u> teaches, a carrier is not liable for bad faith in such a situation.

In addition, as expressed in <u>Contreras</u>, Florida law holds that once a carrier attempts to secure a release for its insured but the claimant is unwilling to provide such a release, the carrier has fulfilled its good faith obligations towards its insured.  <u>See</u> <u>Contreras</u>, 927 So. 2d at 21 ("Since U.S. Security could not force [the claimant] to settle and release [the insured driver], it did all it could do to avoid excess exposure to [the insured driver]").  In the instant case, this is precisely what happened.  First Liberty repeatedly attempted to settle the claim for the policy's $25,000 limits.  At all times, Plaintiff insisted upon obtaining an asset affidavit as a condition to settlement, a condition that can be satisfied only by the insured.  First Liberty completed its part of the proposed settlement – tendering the $25,000 policy limits – but the insured refused to settle without the affidavit.  First Liberty repeatedly advised the insured of the settlement condition and that only the insured could satisfy that condition.  Because the insureds refused to

CASE NO.:  07-20710

complete the requested affidavits (for whatever reason), First Liberty had fulfilled its good faith obligations, as it could not force either its own insured or the claimant to settle on terms to which those parties would not agree.

## **CONCLUSION**

In sum, First Liberty complied with the duties owed to its insureds that are recognized and required under Florida law with respect to settlement of Plaintiff's claim.  First Liberty continually and repeatedly advised its insureds as to settlement opportunities, advised its insureds as to the probable outcome of the litigation and the likelihood of an excess judgment, advised its insureds as to steps the insureds could take to avoid an excess judgment, investigated the facts of the accident, and repeatedly tendered the policy limits in an effort to settle the claim against its insureds.  The simple fact remains that it was not any actions by First Liberty that caused the claim not to settle, but instead, it was the insured's own actions in failing to complete the asset affidavits that caused the failure of the settlement negotiations.  Florida law does not create liability for an insurance carrier where the actions of its insureds are the reason for the failure to settle.

**WHEREFORE,**  First Liberty respectfully requests an order entering summary judgment in its favor and denying Plaintiff's motion for summary judgment.

CASE NO.:  07-20710

Respectfully submitted,

**AKERMAN SENTERFITT**
Attorneys for First Liberty
One Southeast Third Avenue, 25th Floor
Miami, FL  33131-1704
Phone:  (305) 374-5600
Fax:  (305) 374-5095


By:  s/ Gary J. Guzzi                                            _____
     MARK S. SHAPIRO
     Florida Bar Number: 894631
     E-mail: mark.shapiro@akerman.com
     GARY J. GUZZI
     Florida Bar Number: 159440
     E-mail: gary.guzzi@akerman.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of February, 2008, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will serve an electronic notice of filing upon **Ed Rubinoff, Esq. and Andrew Moss, Esq.**, Kutner, Rubinoff & Moss, P.A., P.O. Box 9700, Miami, FL 33101-9700.


/s Gary J. Guzzi                                            
Attorney