# EXHIBIT "F"

3

---

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
 2
            CASE NO.: 07-20710-CIV-JORDAN
 3
   GABINA MALDONADO, as personal
 4 Representative of the Estate
   ALVIN MALDONADO,
 5
        Plaintiff(s).
 6
   vs.
 7
   THE FIRST LIBERTY INSURANCE
 8 CORPORATION,
 9     Defendant(s).
10 _____/
11
12
13
14
            Kutner Rubinoff & Moss
15          501 Northeast 1st Avenue
            Suite 300
16          Miami, Florida 33132
            September 19, 2007
17          Wednesday, 3:10 p.m.
18
19
20     DEPOSITION OF BARRY M. SNYDER, ESQ.
21
      Taken on behalf of the Defendant, The First Liberty
22 Insurance Corporation before Gilda Pastor-Hernandez, Registered
   Professional Reporter, Florida Professional Reporter and Notary
23 Public in and for the State of Florida at large, pursuant to a
   Notice of Taking Deposition Duces Tecum filed in the above
24 cause.
                        - - -
25
```

**Page 3 — EXHIBITS**

| | | For ID |
|---|---|---|
| Defendant's | | |
| 1 - Production From Mr. Snyder's File | | 5 |
| 2 - Letter From Victor M. Gonzalez Dated 1-23-04 | | 10 |
| 3 - Letter From Dan Scarborough Dated 1-29-04 | | 14 |
| 4 - Claim Notes Bates Stamped LM0137 | | 16 |
| 5 - Letter From Brigitte Klein Dated 2-11-04 | | 22 |
|    Attaching Affidavits | | |
| 6 - Letter From Barry M. Snyder, Esq. Dated 5-14-04 | | 27 |
| 7 - Affidavit Bates Stamped LM0404 - LM0408 | | 27 |
| 8 - Letter From Brigitte Klein Dated 5-26-04 | | 42 |
| 9 - Letter From Barry M. Snyder, Esq. Dated 6-16-04 | | 43 |
| 10 - Letter From Julio E. Munoz, Esq. Dated 7-29-04 | | 68 |
| 11 - Letter From Julio E. Munoz, Esq. Dated 12-21-04 | | 68 |
| 12 - Defendant's First Request For Admissions and | | |
|    Plaintiff's Response | | 77 |
| 13 - Letter From Barry M. Snyder, Esq. Dated 7-13-04 | | 82 |
| 14 - Letter From Brigitte Klein Dated 7-20-04 | | 86 |
| 15 - Claim Notes Bates Stamped LM0135 | | 87 |

---

2

**Page 2**

```
 1 APPEARANCES:
 2    KUTNER RUBINOFF & BUSH, P.A.,
      By: Edward G. Rubinoff, Esq.
 3       501 Northeast 1st Avenue
         Suite 300
 4       Miami, Florida 33132
         on behalf of the Plaintiff.
 5
 6    AKERMAN SENTERFITT, P.A.,
      By: Gary J. Guzzi, Esq.,
 7       1 Southeast 3rd Avenue
         25th Floor
 8       Miami, Florida 33131
         on behalf of the Defendant.
 9
10
11
12
13
14              INDEX
15
   Witness          Direct   Cross
16
17 Barry M. Snyder, Esq.    4      91
18                          97     112
19                          113
20
21
22
23
24
25
```

**Page 4**

```
 1 Thereupon:
 2          BARRY M. SNYDER, ESQ.
 3 having been first duly sworn and responded "Yes," was
 4 examined and testified as follows:
 5          DIRECT EXAMINATION
 6 BY MR. GUZZI:
 7   Q.  Good afternoon, Mr. Snyder.
 8   A.  Good afternoon.
 9   Q.  Will you state your name for the court reporter,
10 please?
11   A.  Barry Snyder, S-N-Y-D-E-R.
12   Q.  Mr. Snyder, you're an attorney.
13   A.  Yes.
14   Q.  So you certainly know the rules of deposition.
15   A.  Yes.
16   Q.  Don't need to go through them with you.
17   A.  No.
18   Q.  Great.
19       MR. GUZZI: Before we get started, Ma'am Court
20   Reporter, we'll mark this as Exhibit 1.
21 BY MR. GUZZI:
22   Q.  You had produced, I don't know, maybe a month or two
23 ago your file on this case or nonprivileged portions of it or
24 something.
25   A.  Correct.
```

2 (Pages 5 to 8)

5

1   Q.   What I've done is I've gone through your file.
2 Rather than bringing two boxes here, 98 percent of which is
3 irrelevant, I picked through all the things that related to the
4 potential settlement and settlement negotiations at the
5 beginning before the lawsuit was filed.  This is what I have in
6 my hand, and I'm going to mark this as Exhibit 1.
7          (Thereupon, the documents referred to were marked
8     Defendant's Exhibit Number 1 for identification.)
9 BY MR. GUZZI:
10   Q.   Now, I understand that without your whole file here,
11 you kind of have to take my word for it; but if you wouldn't
12 mind just taking a look at it and just sort of take a cursory
13 glance, and let me know if that looks like the stuff that's in
14 your file related to a potential settlement negotiation.  I
15 will say this:  I took out fax cover sheets, copies of checks,
16 certified mail, return receipts, that sort of thing.  I was
17 just kind of looking for real correspondence.  That's what I
18 included in there.
19        MR. RUBINOFF:  All right.  I don't see one letter in
20 here, okay, there's a letter – let me find it – as a
21 follow-up to yours, yours meaning Liberty Mutual's, May 26
22 letter.  There is his June 16th letter.
23        MR. GUZZI:  Okay.  Is that not in there?
24        MR. RUBINOFF:  That's not in there.
25        MR. GUZZI:  Okay.  Well, I just copied what was in

6

1 the file, so maybe it didn't get included in what he had
2 produced over to us.  I don't want this to purport as this
3 is the entirety of the file, and if it's not in here, I
4 never got it.
5        MR. RUBINOFF:  Because it is a crucial letter.
6        MR. GUZZI:  No, absolutely, and I'll go through all
7 the letters and I think we all can agree on them.  I just
8 wanted to say that's what we have.
9        MR. RUBINOFF:  Well, let me as part of your exhibit
10 then ---
11        MR. GUZZI:  Ed, I don't want to add it as part of the
12 exhibit.  That's just what I have.
13        MR. RUBINOFF:  Okay.  Let me make a copy of this then
14 while we're waiting.
15        MR. GUZZI:  I've already got one.
16        MR. RUBINOFF:  Oh, you have it?
17        MR. GUZZI:  Yeah, I have a whole stack of the
18 documents we've all been working off of, and I'm going to
19 go through all these during the course of the deposition.
20 We'll have them all as exhibits during the course of the
21 deposition.
22        All I want to do is just mark as Exhibit 1 the stuff
23 that was produced to us.  That's what I have, and if it's
24 actually in his file and it somehow didn't get produced to
25 us, you know, I don't have a problem with that.  I'm not

7

1 going to sit here and ---
2        MR. RUBINOFF:  You may have overlooked it.
3        MR. GUZZI:  That's a possibility, too, absolutely.
4        MR. RUBINOFF:  Okay.  Well, we'll agree that these
5 are portions of Mr. Snyder's file representing
6 correspondence to and from Liberty Mutual.
7        MR. GUZZI:  Fair enough.
8        MR. RUBINOFF:  Some of the correspondence.
9        MR. GUZZI:  Sure.
10 BY MR. GUZZI:
11   Q.   All right.  Now, Mr. Snyder, have you had a chance to
12 take a look through it?  Just at a cursory glance, does this
13 look like the contents of your file as it relates to settlement
14 discussions --
15        MR. RUBINOFF:  Some of the correspondence.
16   Q.   -- or some of the correspondence relating to the
17 settlement negotiations?
18   A.   These look like, you know, some of the correspondence
19 that was in my file, yes.
20   Q.   Okay.  Fair enough.  And the original file that you
21 have, do you still have an original file of correspondence
22 related to the settlement negotiations?
23   A.   Yes.
24   Q.   And where would that file be?
25   A.   Right now I'm not sure whether it's in my office or

8

1 if Mr. Rubinoff has it.
2   Q.   Okay.  But somewhere there's a file?
3   A.   Yes.
4   Q.   And so if I needed to look at the original file, I
5 would be able to look at it somewhere?
6   A.   Absolutely.
7   Q.   And in your file you would have kept all of the
8 correspondence?
9   A.   Yes.
10   Q.   If a particular document were not in your original
11 file, do you have an explanation as to why it wouldn't be
12 there?
13   A.   Well, in my office, it could be misplaced or
14 misplaced in another law office.
15   Q.   Okay.  Fair enough.  Okay.  Mr. Snyder, you said
16 you're an attorney.  How long have you been an attorney?
17   A.   Since 1976.
18   Q.   Generally, what kind of practice do you do?
19   A.   I do personal injury and criminal defense.
20   Q.   Where is your office?
21   A.   North Miami Beach.
22   Q.   Now, you handled the representation of the Estate of
23 Alvin Maldonado versus Carlos and Julia Clinche; is that
24 correct?
25   A.   Correct.

**9**

1    Q.   And you were the attorney for the estate?

2    A.   Correct.

3    Q.   And in that role, you were involved with initially

4 negotiating with Liberty Mutual to perhaps settle any claim

5 that the estate may have had against Mr. and Mrs. Clinche.

6    A.   Correct.

7    Q.   And then when those settlement negotiations didn't

8 come to fruition, were you then the plaintiff's attorney in the

9 resulting litigation?

10   A.   Correct.

11   Q.   And that litigation is now complete?

12       MR. RUBINOFF:  Well, complete in the sense that there

13   was, you know, a settlement agreement.

14 BY MR. GUZZI:

15   Q.   Okay.  Well, the underlying litigation, has it been

16 closed?  Is there anything left to do?

17   A.   I'm not sure at this point.

18   Q.   Okay.  Well, has a judgment been entered?

19   A.   Yes.

20   Q.   Against?

21       MR. RUBINOFF:  I think there's an issue on attorney's

22   fees.  Is that what it is?

23       THE WITNESS:  Yeah, that might be an issue.

24       MR. RUBINOFF:  Offer of judgment or something like

25   that.

**10**

1 BY MR. GUZZI:

2    Q.   Okay.  So maybe some collateral type issue.

3    A.   Correct.

4    Q.   But the judgment has been entered.

5    A.   Correct.

6    Q.   And now, you understand that you're here now to

7 testify in the subsequent bad faith litigation that's been

8 filed against First Liberty; correct?

9    A.   Yes.

10   Q.   Are you an attorney of record in the bad faith suit?

11   A.   No.

12   Q.   Tell me what was your first involvement in the --

13 when I talk about the underlying case, I'm going to refer to

14 the commencement of your representation of the Estate of Alvin

15 Maldonado with respect to claims against Julio and Carlos

16 Clinche.  Okay?  I'm going to refer to that as the underlying

17 case.  Fair enough?

18   A.   Yes.

19   Q.   What was your first involvement in the underlying

20 case?

21   A.   I think when I was contacted by close friends of hers

22 to represent her.

23       MR. GUZZI:  Let's mark this as two.

24       (Thereupon, the document referred to was marked

25   Defendant's Exhibit Number 2 for identification.)

**11**

1 BY MR. GUZZI:

2    Q.   Mr. Snyder, I'm handing you what's been marked as

3 Exhibit 2.  Do you recognize that document?

4    A.   Yes.

5    Q.   And what do you recognize it to be?

6    A.   It's our document, sending a letter to Liberty Mutual

7 putting them on notice that we now are representing the

8 Maldonado family, the Estate of Alvin Maldonado and requesting

9 for them to provide us insurance information.

10   Q.   Before you sent this letter to Liberty Mutual, did

11 you have any contact with Liberty Mutual?

12   A.   I don't recall.

13   Q.   At this point when you had sent this letter, had you

14 done any preliminary investigation into the accident or

15 liability issues or anything like that?

16   A.   I'm not really sure of the time sequence.  We might

17 have tried to get a preliminary police report I think because

18 this was a homicide case, we didn't get a homicide report for

19 almost six months.

20   Q.   Okay.  And in your letter you talk about how your

21 investigation into the matter indicated that Liberty's

22 insured's negligence was a contributing factor to this

23 accident.  Do you see where I'm referring --

24   A.   Correct.

25   Q.   -- to that?

**12**

1    A.   Correct.

2    Q.   Do you recall what investigation that would have been

3 that would have led to that conclusion?

4    A.   Well, we had the regular police report which

5 indicated that Ms. Clinche ran a red light and struck, you

6 know, Maldonado's car, caused the collision, and we certainly

7 at that point knew that he died as a result of the collision.

8 So I think that was sufficient in this particular set of

9 circumstances to know the cause and effect of the accident, and

10 obviously his death told us what the damages were considering

11 she was married and had three children, all minors.

12   Q.   And at this sort of preliminary point where you have

13 maybe your preliminary police report, you know Mr. Maldonado

14 is killed, three minor children, those sort of factors you just

15 talked about, did you have a preliminary thought as to what the

16 value of the claim for the estate would have been?

17   A.   In the millions.

18       MR. RUBINOFF:  You're talking about the estate

19   including the survivors?

20       MR. GUZZI:  Yes.

21 BY MR. GUZZI:

22   Q.   And the claim would have been made against the

23 Clinches as a result of the accident on behalf of the estate?

24   A.   Correct.

25   Q.   That was in the millions you said?

13

1  A.  Yes.

2  Q.  After you sent this initial letter to Liberty Mutual

3  dated January 23, 2004. what is your recollection of what

4  occurred next?

5      MR. RUBINOFF:  With regard to Liberty Mutual?

6      MR. GUZZI:  With regard to Liberty Mutual.

7      MR. RUBINOFF:  You can look at the letters. I mean,

8  you know --

9      THE WITNESS:  Well. you're handing me a letter

10  that's dated January 29th from the Liberty Mutual

11  explaining that they have a 25,000 per person 50,000 per

12  occurrence policy. They're stating there's no excess

13  policy that they're aware of and that they're offering the

14  $25,000 and request a complete release of all claims and

15  it says apparently as per your request, meaning me. that

16  we had requested an affidavit concerning the insurance.

17  the policy -- make sure that that is correct -- and that's

18  it that I can think of in this letter. Oh, and an

19  affidavit concerning the assets.

20 BY MR. GUZZI:

21  Q.  Okay. Now, in the letter here it references a

22 telephone conversation that you had had with Mr. Scarborough at

23 Liberty Mutual. Do you recall the specific -- do you recall

24 having a phone call with Mr. Scarborough or somebody at Liberty

25 Mutual that would have led to this letter?

14

1  A.  The only thing I can recall of the conversation would

2  be simply the facts that we've stated, you know, representing

3  the client, police report, death, this is what occurred,

4  requesting, you know, to get something, a written verification

5  as to policy limits and assets.

6  Q.  Sitting here today, do you have an independent

7  recollection of actually having such a phone conversation?

8  A.  No.

9      MR. GUZZI:  All right. Let's mark this as Exhibit 3,

10  the January 29th letter we've just been looking at.

11      THE WITNESS:  I mean, unless there's something very

12  specific or unusual that you could refresh my memory

13  about.

14      (Thereupon, the document referred to was marked

15  Defendant's Exhibit Number 3 for identification.)

16 BY MR. GUZZI:

17  Q.  Now, turning to your file, at least portions of your

18 file -- and when I say your file for the rest of the

19 deposition, I don't mean to imply it's your entire file, it's

20 just easier to say your file -- if you look here there's the

21 same January 29, 2004 letter that we've marked as Exhibit 3 and

22 in addition there's a release and then there's three pages of

23 looks like the declarations page. You see that?

24  A.  Um-hmm.

25  Q.  Okay. And you see that in the letter, cover letter

15

1  dated January 29, Mr. Scarborough references the release and

2  the declarations page. In the first paragraph you see where he

3  references --

4  A.  Yes, the declaration page.

5  Q.  -- and then the second paragraph where he references

6  the release.

7  A.  Correct.

8  Q.  Okay. And then did the documents that are directly

9  behind it in Exhibit 1, the release and three pages of the

10 declarations, those would have been the documents enclosed with

11 that January 29 letter?

12  A.  Well, I'm not sure, you know, because I'm trying to

13 go by memory, but if you look at the last paragraph, it says;

14  "Also, per your request, I have forwarded an affidavit

15  concerning assets and additional insurance to our insureds

16  for completion. Once I am in receipt of the executed

17  documents, I will forward them to you," and on the back of

18  this, you have attached the ---

19      MR. GUZZI:  No, no, stop right there.

20      THE WITNESS:  Oh, that's not attached?

21      MR. GUZZI:  No.

22      THE WITNESS:  Okay.

23      MR. GUZZI:  All I'm looking for -- I'm looking at the

24  January 29, 2004 letter. Behind it is the release, behind

25  that is three pages of the declarations and that's all

16

1  that I'm looking at.

2      THE WITNESS:  Oh, okay. It could be.

3  BY MR. GUZZI:

4  Q.  Well, assuming this is in your file here, okay,

5  because we don't have the original file with us ---

6  A.  No, no. What I'm saying is I've seen this letter.

7  Q.  Yeah.

8  A.  And I'm just saying and I understand that this is

9  the declaration sheet, okay, for the insurance.  I just -- I

10 don't remember whether the release and dec was attached in this

11 letter or not.

12  Q.  Okay.

13  A.  But it could have been.

14  Q.  Okay.

15      MR. RUBINOFF:  You know, for all intents, it was,

16  okay, so it's not a big issue.

17      MR. GUZZI:  Okay. Fair enough.

18      MR. RUBINOFF:  No reason to believe it wasn't.

19 BY MR. GUZZI:

20  Q.  Perfect. Is that your testimony?

21  A.  Yes.

22  Q.  Then I'll move on.

23      MR. GUZZI:  Let's mark this as Exhibit 4.

24      (Thereupon, the document referred to was marked

25  Defendant's Exhibit Number 4 for identification.)

17

BY MR. GUZZI:

2   Q.   Mr. Snyder, first of all, I want you to take a look
3 at this document, what's been marked as Exhibit 4. This is a
4 printout from some of the computer claims notes of Liberty
5 Mutual, and the first question I have is, have you ever seen
6 this or similar document before?

7   A.   I'm not sure. It might look familiar, but I might
8 have seen it but I'm not positive.

9   Q.   Okay. What I want to refer you to is the entry that
10 I'm pointing to that for the record is created January 28, 2004
11 at 5:39 p.m. and then it continues to the one listed above it.
12 You have to read from the bottom up.

13   A.   Okay. So it's this one.

14   Q.   Starts here and then the one directly above it that's
15 dated January 28, 2004 at 5:42 p.m.

16   A.   Okay.

17   Q.   So if you can read those two boxes.

18       MR. RUBINOFF: You have to continue up here. It's
19   screwed up. I mean, it's ---

20       THE WITNESS: Okay.

21 BY MR. GUZZI:

22   Q.   Have you had an opportunity to read it?

23   A.   Yes.

24   Q.   Now, that you've read that computer note entry that
25 Mr. Scarborough entered, does that in any way refresh your

18

1 recollection of the substance of any phone conversation you may
2 have had with Mr. Scarborough?

3   A.   Not really, other than it seems like that's what
4 transpired. It's very basic, so I mean, it wasn't an in-depth
5 conversation, so --

6   Q.   But my question is, after you read this, does this
7 jog your memory at all?

8   A.   When, you say jog your memory, I'm not sure what you
9 mean, by the facts, everything in here seems to me to be
10 correct, you know.

11   Q.   Okay. Here are my two questions: First question is,
12 now that you've read this, do you now have a memory saying, oh,
13 yeah, now I remember having that conversation?

14   A.   No.

15   Q.   Okay. Now, that you've read this and you don't have
16 a recollection of this conversation ---

17   A.   Let me just explain.

18   Q.   Okay.

19   A.   It's not like, okay, now I read it, oh, yeah, yeah, I
20 remember Joe and I were talking, you know. I remember, yes, it
21 makes sense that we had a conversation, and I explained to him
22 that we're opening up the estate. I believe that, you know, no
23 checks would be tendered unless an estate was opened, and
24 that's all I remember.

25   Q.   Okay. And the contents of the letter and what

19

1 Mr. Scarborough notes as to the substance of your conversation,
2 do you have any reason to believe that those notes are
3 inaccurate as to the substance of your conversation and what
4 was spoken?

5   A.   No.

6   Q.   Do you have a recollection of advising
7 Mr. Scarough that you'd like to get an affidavit from the
8 insureds regarding their assets and other potential insurance?

9   A.   I would do that, so I guess I did ask him that.

10   Q.   But you can't sit here today and say specifically
11 what exactly you would have advised Mr. Scarborough in terms of
12 the contents or the language or what information would have
13 been contained in any such affidavit?

14   A.   I don't recall having any kind of a specific
15 conversation for the first phone call.

16   Q.   Okay. Fair enough. Now, at this point, when you
17 have this conversation with Mr. Scarborough and you request an
18 affidavit of the insureds, what is the purpose of requesting an
19 affidavit of the insureds regarding their assets and other
20 insurance?

21   A.   To see what would be available in terms of additional
22 funds to pay possibly above the policy if the people had funds
23 or maybe they could have additional funds that might be
24 available to add to the value of the claim since the value of
25 the claim was extremely more than what the policy limits were.

20

1   Q.   Now, it was your understanding here based on the
2 conversation or the letter that there was a $25,000 policy
3 limit?

4   A.   Right, and it's also because there could be a
5 question about malpractice, because it's a standard operating
6 procedure that if we would settle a claim and it turned out
7 that there were substantial assets that they could have
8 contributed to meet the value of the claim and we did nothing
9 to ferret that out, then we would be, you know, remiss in that
10 as far as our duties as a lawyer.

11   Q.   Now, at this point, clearly you would not be willing
12 to settle this case for the $25,000 policy limits?

13   A.   Without having verified the financial assets of the
14 person and talking to my client?

15   Q.   That's correct.

16   A.   Yes.

17   Q.   Because your initial analysis of this case is this is
18 worth in the millions; right?

19   A.   Correct.

20   Q.   And you're not going to recommend a settlement that
21 says you should take $25,000 period, end of story, without any
22 further in investigation; right?

23   A.   Correct.

24   Q.   I think, as you mentioned, it probably would border
25 on malpractice if you did something like that; right?

6 (Pages 21 to 24)

21

1    A.    Correct.
2    Q.    And so the purpose of requesting an affidavit is to
3 see whether the Clinches may have had some other assets or
4 other insurance that can go on top of the Liberty Mutual policy
5 limits, such that the combination could then settle the case?
6    A.    Correct, or to ensure to the client that there are no
7 really viable assets and to condition them that maybe the best
8 thing to do is to move on, so --
9    Q.    It's better to get 25,000 than nothing or spend it
10 all on attorney's fees or costs or something like that?
11   A.    Correct.
12   Q.    At this point when you spoke with Mr. Scarborough,
13 did you forward to Mr. Scarborough a specific affidavit that
14 you wanted the insureds to complete and return?
15   A.    I know we sent an affidavit, but I don't know if it
16 was Mr. Scarborough or somebody else.
17        MR. RUBINOFF:  Are you saying at that point in time?
18        MR. GUZZI:  I'm talking about in January, January
19 29th, at the very beginning.
20        THE WITNESS:  I don't recall.
21 BY MR. GUZZI:
22   Q.    All right.  If there's nothing in your file that
23 would show that you sent an affidavit at that time, would you
24 then tend to believe that there wasn't any affidavit sent to
25 Liberty Mutual?

22

1    A.    Correct.
2    Q.    And you have no specific recollection of sending any
3 type of affidavit at that time to Liberty Mutual?
4    A.    Correct.
5    Q.    If you had, there would be some type of
6 correspondence in your file?
7    A.    Yes.
8    Q.    So at this point, once you speak with
9 Mr. Scarborough, tell him that you need to get an asset
10 insurance affidavit, until you receive the affidavit back or
11 some type of response from Liberty Mutual, you're not going to
12 settle anything; right?
13   A.    Correct.
14   Q.    You're waiting to hear back from Liberty.
15   A.    Correct.
16        MR. GUZZI:  Off the record.
17        (Thereupon, a brief discussion was held off
18 the record, after which the following proceedings
19 were had.)
20        MR. GUZZI:  Let's mark this as the next exhibit.
21        (Thereupon, the document referred to was marked
22 Defendant's Exhibit Number 5 for identification.)
23 BY MR. GUZZI:
24   Q.    Mr. Snyder, I'm handing you what's been marked as
25 Exhibit 5.  It's a February 11, 2004 letter from Liberty Mutual

23

1 addressed to you and attaching two completed affidavits.  Do
2 you see that?
3    A.    Yes.
4    Q.    And referring you back to Exhibit 1, it looks like
5 the same documents in here, the same, February 11, 2004 letter
6 and the two signed affidavits.  Do you see that?
7    A.    Correct.
8    Q.    Now, do you recall receiving this letter and the
9 affidavits?
10   A.    I remember getting the letter and the affidavits,
11 yes.
12   Q.    Now, when you received the letter and the affidavits,
13 what did you do?
14   A.    In terms of what?
15   Q.    Well, what happened?  Did you review them?
16   A.    I'm sure we reviewed them, yes.
17   Q.    Did you do any analysis as to how those would affect
18 your settlement posture?
19   A.    Well, it was incomplete.  It really -- we were
20 expecting to have an affidavit of assets, and I didn't consider
21 this an affidavit of assets.
22   Q.    What did you consider it to be?
23   A.    A legal conclusion.
24   Q.    Why is that?
25   A.    Because it says, "In addition, I have no assets that

24

1 would be available to satisfy any claims against me."
2        That's a legal conclusion and there's no mention
3 about what assets they have.
4    Q.    Okay.  Now, the first -- I'm sorry.  Can I take a
5 look at that for a minute?  These are identical affidavits here
6 other than the names that are filled in.
7    A.    Correct.
8    Q.    Now, the first paragraph, it just says their names,
9 they're competent, et cetera.  You have no problem with that;
10 correct?
11   A.    It says, "My name is Julia Clinche.  I am over 18
12 years of age and I am competent to testify regarding
13 the matters in this affidavit as of my own personal
14 knowledge."
15   Q.    Okay.  That paragraph, any problem with that?
16   A.    No.
17   Q.    Now, the second paragraph where it talks about other
18 than this particular insurance policy that she has no other
19 policies, do you see that?
20   A.    Yes.
21   Q.    Any problems with that?
22   A.    No.
23   Q.    So your concern about the affidavit is focused solely
24 on paragraph three; correct?
25   A.    Correct.

25

1 Q.   And you're referring to the language that talks about
2 "I have no assets that would be available to satisfy any
3 claims against me," right?
4 A.   Correct.
5 Q.   Okay.  And in your mind that's some type of legal
6 conclusion --
7 A.   Yes.
8 Q.   -- as opposed to I have no assets, period?
9 A.   No, that's also a legal conclusion possibly.
10 Q.   Well, what if a person doesn't have any assets and
11 they write in I have no assets, that's not a legal conclusion;
12 is it?
13 A.   Well, I guess you're getting down to semantics.  You
14 find somebody like that, I guess maybe a homeless person, but
15 not somebody who owns a home and a car.
16 Q.   Okay.  Fair enough.  Or if the affidavit had said, I
17 have the following assets and then listed out whatever assets
18 that they would have, that's what would satisfy you, something
19 along those lines?
20 A.   Well, what would satisfy is something like a divorce
21 affidavit that they used or any kind of financial affidavit
22 when you take a loan out, anything that basically lists to any
23 person on any kind of serious matter, where they say, I have
24 this bank account, I have these stocks, I own this real estate
25 or I don't own real estate, you know, just very basic, I'm

26

1 employed, I make X amount of dollars a year.  Those are the
2 kind of things I think most people -- at least I speak for
3 myself, that's what I would consider assets or looking at
4 assets.
5 Q.   Okay.  So you get this affidavit, you determine that
6 it's insufficient for your settlement purposes.
7 A.   Correct.
8 Q.   The next correspondence that appears in the various
9 files appears to be a May 14, 2004 letter from yourself to
10 Brigitte Klein at Liberty Mutual.
11     Now, before we discuss this document, do you have any
12 recollection of anything that would have happened between the
13 February 11, 2004 letter to you from Liberty that enclosed the
14 affidavits and your May 14 letter back to Liberty Mutual?
15     MR. RUBINOFF:  As it relates to --
16     MR. GUZZI:  To the settlement of the claim.
17     MR. RUBINOFF:  Correct, just between him and Liberty
18 Mutual.
19     MR. GUZZI:  Yes.  I don't care about what you were
20 doing with your clients, that sort of thing.
21     THE WITNESS:  I don't have any recollection.
22 BY MR. GUZZI:
23 Q.   If something happened, there would be correspondence
24 in your file or some notes or something like that?
25 A.   You know, I don't know.

27

1 Q.   Okay.  But you can't sit here and say one way or the
2 other that you specifically did something in these few months,
3 in between February and May as it regards to potential
4 settlement of the claim?
5     MR. RUBINOFF:  Between you and Liberty Mutual.
6     THE WITNESS:  I don't recall whether there was any,
7     you know, contact.
8     MR. GUZZI:  Okay.  Fair enough.
9     Let's mark this letter as the next exhibit and that
10 should be six and then the blank affidavit as seven.
11     (Thereupon, the documents referred to were marked
12 Defendant's Exhibit Numbers 6 and 7, respectively, for
13 identification.)
14 BY MR. GUZZI:
15 Q.   Now, Mr. Snyder, taking a look at Exhibit 6 which is
16 the May 14 letter, you write in there that the affidavits are
17 insufficient as they do not address all assets.  Do you see
18 what I'm referring to?
19 A.   Um-hmm.
20     MR. RUBINOFF:  You have to say yes.
21     THE WITNESS:  Yes, yes, yes.
22 BY MR. GUZZI:
23 Q.   That's the discussion you and I just had; right?
24 A.   Correct.
25 Q.   Okay.  And then in your next paragraph, you say we

28

1 ask that they execute the attached affidavits and return them,
2 et cetera.  Do you see that?
3 A.   Correct.
4 Q.   And then Exhibit 7, are these the affidavits that you
5 provided to Liberty Mutual for the insureds to complete?
6 A.   Correct.
7 Q.   Now, let's take a look at this affidavit.  Is this an
8 affidavit that you drafted?
9 A.   It's an affidavit that -- in my office we looked at
10 financial affidavits from divorce, et cetera, which were
11 actually more complex and more involved which information we
12 really didn't need.  So we just asked for the very basic
13 information that is found on any kind of financial affidavit,
14 and I believe we kind of just took the basics from the divorce
15 affidavit, cut it down, make it just very, very basic.
16 Q.   And so at this point when you send this letter to
17 Liberty Mutual and the affidavit, at this point, you are still
18 not willing to settle the claim for the policy limits without
19 getting any additional information; correct?
20 A.   Correct.
21 Q.   Now, in this affidavit, there are general questions
22 about the background, employment and earnings, ownership and
23 any interest in other things, loans and debts, et cetera.  You
24 see all that?
25 A.   Correct.

29

1  Q.  Okay.  Now, this covers more topics than simply
2 assets; right?
3  A.  You know, I guess it's how you look at it.  I don't
4 think so.
5  Q.  Well, it has things about -- for instance, as a
6 simple example, it talks about a place of birth.  Now, that has
7 nothing to do with their assets; right?
8  A.  No, but it has to do with verification of assets.
9  Q.  Okay.  Fair enough.  And then it has some employment
10 and earnings questions.
11  A.  It certainly has to do with assets.
12  Q.  But I mean, that's talking about how much money they
13 make and where they work; right?
14  A.  Well, isn't that assets?
15      MR. RUBINOFF:  No, don't argue with him.  Just
16 answer the question.
17      THE WITNESS:  I'm sorry.  Yes.
18 BY MR. GUZZI:
19  Q.  Yes?
20  A.  Yes.
21  Q.  Now, clearly, it's all related to topics that might
22 assist in finding out whether the Clinches may have some money
23 or property or something else; yes?
24  A.  Yes.
25  Q.  But this affidavit clearly is much more substantial

30

1 and more detailed than the original affidavit that was
2 completed by the Clinches?
3  A.  Correct.
4  Q.  And what was your purpose in asking for all of this
5 various information that's contained in the affidavits?
6  A.  To determine what assets the Clinches have and to be
7 able to verify it.
8  Q.  And why would you want that information?
9  A.  To determine whether there was a possibility or
10 impossibility of getting any additional money above and beyond
11 the policy.
12  Q.  And so if the affidavits are completed by the
13 Clinches and they say we have six Swiss bank accounts with
14 $100,000,000 in them, then obviously, you're not going to
15 settle for the $25,000 policy limits; right?
16  A.  Correct.
17  Q.  If they have an affidavit that says hypothetically, I
18 have nothing, then you may be more willing to settle for the
19 $25,000 policy limits; right?
20  A.  Correct.
21  Q.  If they send back an affidavit that says I have a
22 house, I have a car that has a lien on it and I have some old
23 clothing, then you sort of have to make some type of
24 determination as to whether maybe you can execute on this,
25 maybe whether it's better to settle just for the policy limits

31

1 and move on; correct?
2  A.  Exactly, yes.
3  Q.  Fair enough.  Now, at the time that you sent this
4 letter to Liberty Mutual asking the insureds to complete this
5 affidavit, your settlement position is still, I cannot accept
6 the $25,000 on behalf of my clients unless I get this completed
7 affidavit.
8  A.  Well, unless we had the information that we
9 requested.
10  Q.  Okay.  But at this point, the correspondence says in
11 the May 14, 2004 letter that we ask that they, meaning the
12 Clinches, complete and execute the attached financial
13 affidavits; correct?
14  A.  Correct.
15  Q.  It doesn't say, please provide the information we've
16 requested in this form or any other form; does it?
17  A.  No.
18  Q.  So at this point you were looking for, I want the
19 Clinches to complete this specific affidavit and then I will be
20 able to make a settlement determination.
21  A.  Correct.
22  Q.  Now, you would agree with me that the affidavits that
23 you wanted the Clinches to complete, these affidavits need to
24 be completed by the Clinches themselves; yes?
25  A.  No, not necessarily.

32

1  Q.  Well, when I say completed, I don't mean they need to
2 fill in the handwriting.  I'm saying that the Clinches or
3 somebody needs to provide the information listed here, and then
4 the last page only Julia and Carlos Clinche can sign and have
5 it notarized; correct?
6  A.  They have to swear to the truth of it, right.
7  Q.  Okay.  And they're the only ones who are able to
8 swear to the affidavit that they're signing.
9  A.  Correct.
10  Q.  Liberty Mutual can't complete and sign and send back
11 this affidavit; can it?
12  A.  Not without the Clinches' assistance.
13  Q.  Well, Liberty Mutual can't sign the last page of this
14 and swear to the truth of the information contained therein;
15 can it?
16  A.  Well, they can sit down with their insureds and fill
17 it out with them.
18  Q.  Okay.  I understand that, but the bottom line, at the
19 end of the day, when you get to the last page of the affidavit
20 after all this information that's requested is filled in,
21 however that happens, when it gets to the last page, only Julia
22 Clinche and Carlos Clinche can sign this and swear to the
23 truth?
24  A.  That's correct.
25  Q.  Liberty Mutual can't sign the back of this page?

33

1    A.   No.  However, if Liberty Mutual has information that
2 anything that was put down would be incorrect or inaccurate,
3 then I think they would still be held responsible.
4    Q.   But that's not what I'm asking.
5    A.   Okay.  I just want to clarify my question -- I mean,
6 your question, so --
7    Q.   Sure.  So let me clarify it some more.  If there's an
8 affidavit here that says, name is Julia Clinche and there's an
9 address of Julia Clinche and all of Julia Clinche's assets and
10 other information on here, when you get to the last page,
11 Liberty Mutual can't sign this; right?
12    A.   Correct.
13    Q.   Only Julia Clinche can sign this.
14    A.   Correct.
15    Q.   And the same goes with Carlos Clinche.
16    A.   Correct.
17    Q.   And if Julia and/or Carlos Clinche for whatever
18 reason decide they're not going to sign this, there's nothing
19 that Liberty Mutual can do to get them to sign it; correct?
20    A.   Correct.
21    Q.   And so at this point the condition of your settlement
22 offer -- well, at least the condition of the settlement
23 negotiations that I need to get an affidavit from the insureds,
24 in the end, can only be agreed to by Carlos and Julia Clinche;
25 correct?

34

1    A.   They would need to sign it; correct.
2    Q.   And if Julia and Carlos Clinche for whatever reason
3 don't, Liberty Mutual cannot then comply with what your
4 settlement demand is at that point.
5    A.   Correct.
6    Q.   At this point when you've sent the May 14th letter
7 and you're waiting for the affidavits from the Clinches, what
8 would it have taken in terms of assets or other insurance or
9 other information that would have been provided, what would it
10 have taken for you to settle the claim?
11    A.   I'm sorry.  Can you repeat that?
12    Q.   Sure.  Let's suppose the Clinches actually returned
13 an affidavit, okay, and it provides some assets listed on here,
14 okay, how much in assets or other insurance or other employment
15 history or whatever information is in here, what would have
16 been needed to be in a completed affidavit in order for you to
17 be willing to settle the case?
18    A.   I think basically the basic information that's in
19 there, because it's all basic.  So I'm not clear really what
20 you're asking.
21    Q.   Okay.  Sure.  What if they sent back an affidavit
22 between the two of them, between Mr. Clinche and Mrs. Clinche,
23 and they said, we have $50,000 in our bank account --
24    A.   Okay.
25    Q.   -- and they don't have any other assets --

35

1    A.   Um-hmm.
2    Q.   -- would you have settled the case for the policy
3 limits, plus the $50,000?
4    A.   Well, at that point I would have to verify that it's
5 true, and then I would have to speak with my client.
6    Q.   Okay.  Well, let's assume that it's true.  All right.
7 You do whatever you need to do and you verify there's $50,000
8 in the bank account.
9    A.   Okay.
10    Q.   At that point would you have recommended it to your
11 clients that the case be settled for the $25,000 policy limits
12 plus $50,000?
13    A.   I would have recommended it providing everything else
14 in the investigation -- everything was resolved.
15    Q.   What do you mean by resolved?
16    A.   Well, we had I think between February and May, we
17 were -- you know, in a way, things are looking kind of out of
18 context, but if you understand how things flow in a law office,
19 we were involved with the uninsured motorist, we had to open up
20 the estate, we had to get approval from the Court.  All these
21 things take time, so you know, that would have --
22        MR. RUBINOFF:  Excuse me.  I'm just getting a cramp,
23    so that's the only reason I'm standing up, guys.
24        THE WITNESS:  So that's it.
25 BY MR. GUZZI:

36

1    Q.   Well, let's suppose that the affidavit comes back and
2 they say, you know, I have a thousand dollars in my bank
3 account but I own my house and they don't have any other
4 assets?
5        MR. RUBINOFF:  You know, I've let this go, but I'm
6    going to object to the form of the question as being
7    speculative because that isn't what happened.
8        MR. GUZZI:  Okay.  Fair enough.
9        MR. RUBINOFF:  But go ahead.  If you can answer the
10    question, go ahead.
11        THE WITNESS:  At that point everything would be based
12    on speaking to the client, seeing what she wanted to do,
13    what she felt, and my recommendation would be that if
14    there was really no viable assets or she would have to
15    deplete the assets that we would receive from the policy
16    in order to get something that was not obtainable and so
17    she would come up losing more money, then I would advise
18    her not to do it and to accept the policy.
19        MR. RUBINOFF:  And the 50.
20        THE WITNESS:  And the 50, yeah.
21 BY MR. GUZZI:
22    Q.   Okay.  Well, we were past the 50,000.  We were just
23 talking about there was a thousand dollars in the bank account,
24 but they have a house.
25    A.   Okay.

---

**37**

1  Q.   At that point if that's what the information comes
2  back in here, what would your settlement posture have been?
3      MR. RUBINOFF: Object to the form of the question.
4      THE WITNESS: I don't know. I think I would have to
5  ask if they could maybe come up with some other money,
6  that between them and my clients they thought were
7  reasonable that they could afford to give something to the
8  three minor children that are left without a father.
9  BY MR. GUZZI:
10  Q.   Okay. But let's suppose all they have is a thousand
11 dollars in cash and their house.
12  A.   But they have a house. They might be able to take
13 out an equity loan and pay something off over a period of time,
14 so I don't know. I mean, there are a lot of options that were
15 never addressed.
16  Q.   Let's suppose that they have their house, they have a
17 thousand dollars in cash, but they list that they're both
18 employed -- I'm sorry -- that Mr. Clinche is employed and he
19 earns $50,000 a year. What's your settlement posture at that
20 point?
21      MR. RUBINOFF: Let me object as being speculative. I
22 mean, none of these scenarios that you're suggesting ever
23 took place. Under no circumstances did Liberty Mutual
24 ever follow through to even get into a position to put the
25 plaintiff, you know, into a position to even make these

---

**38**

1  determinations. So you're asking speculative questions,
2  you know, based on information that was never developed or
3  provided.
4      MR. GUZZI: I agree to speculative.
5      MR. RUBINOFF: Okay.
6  BY MR. GUZZI:
7  Q.   Do you need me to repeat the question?
8  A.   Yes.
9      MR. GUZZI: Could you read it back?
10     (Thereupon, the question referred to was read by the
11 reporter as above recorded.)
12     MR. RUBINOFF: Okay. Again, you know, I object to
13 the form of the question as being speculative because it
14 doesn't address what the law is about what you can execute
15 on and what you can't execute on, you know. I mean,
16 you're creating real hypothets here that -- you can go on
17 forever with hypothets that are not based on any facts in
18 evidence or any facts that even came close to, you know,
19 having taken place. I mean, how many hypothets are you
20 going to have, 1000, 1500, you know, 2000? You know, what
21 if there was a $20,000 car, $2,000 car?
22     THE WITNESS: You know, I don't know. It would be
23 something, again, we would have to sit down, because I
24 probably would say -- obviously, we wouldn't do
25 anything -- they need to eat, the Clinches. They would

---

**39**

1  need to provide for themselves. I would have to look to
2  see what they could afford, what we felt they could afford
3  to pay, you know, under those circumstances over a period
4  of time possibly.
5  BY MR. GUZZI:
6  Q.   Okay. How much in assets would it have taken the
7  Clinches in order for you to advise your client that
8  she should not settle for the policy limits in exchange for a
9  release?
10     MR. RUBINOFF: I object. That's really wholly, you
11 know, speculative. I mean --
12     MR. GUZZI: They're all speculative questions.
13 That's not a reason for him not to answer.
14     MR. RUBINOFF: Well --
15     MR. GUZZI: I understand.
16     MR. RUBINOFF: Well, if he can answer the question,
17 but it never took place. I mean --
18     MR. GUZZI: Ed, listen, I have a whole lot of
19 speculative questions to ask. I understand your
20 objection, but you can't keep making the same objection
21 and talking about it.
22     MR. RUBINOFF: Well, he's answered the question.
23 He's saying there's no way to answer it without knowing
24 just what is out there.
25     MR. GUZZI: If that's what he's going to say, fine,

---

**40**

1  but I need to ask the question. I understand you object
2  to the form. Leave it at that.
3      THE WITNESS: I would, again, I would have to -- no,
4  because there could have been numerous -- there could be
5  numerous things. I don't know at that time my client's,
6  you know, emotional state. I don't know whether she would
7  say, you know -- I don't know.
8  BY MR. GUZZI:
9  Q.   Okay. Well, if the Clinches come back with an
10 affidavit that says I have $10,000,000 in cash sitting in my
11 bank account, would you have recommended to your client that
12 you take the $25,000 in policy limits in exchange for a
13 release?
14     MR. RUBINOFF: Again, speculative.
15     THE WITNESS: No.
16 BY MR. GUZZI:
17  Q.   Same answer if they had a million dollars?
18     MR. RUBINOFF: Object to form.
19     THE WITNESS: Correct.
20 BY MR. GUZZI:
21  Q.   So some point -- I mean, I understand this is all
22 hypothetical here, but at some point if they have enough money
23 or assets, you're going to advise your client that you should
24 continue with the lawsuit and not take the $25,000 policy
25 limits in exchange for a release; correct?

---

**41**

1      MR. RUBINOFF: Again, speculative.
2      THE WITNESS: No, because you're totally missing the
3  point about trying to resolve the matter. So you ask me a
4  question saying, would I just tell them, okay, if they
5  have X amount of assets, just continue the lawsuit. No, I
6  would have told them, let's sit down and let's see if
7  there's something that they feel comfortable with that
8  they could pay above the policy for what happened and
9  something where my clients would feel that they could
10 accept and then we could possibly resolve the case without
11 a lawsuit.
12 BY MR. GUZZI:
13  Q.   Well, what would your recommendation have been under
14 that scenario where the Clinches would pay some sort of money?
15     MR. RUBINOFF: Object to the form.
16     THE WITNESS: I don't know, because I would have to
17 see -- first of all, it would be a three-prong thing. I'd
18 have to see what are really the assets of the Clinches,
19 which today I still don't know. Two, I would have to see
20 based upon the information and verified information, what
21 realistically they might be able to afford to pay, what
22 they are willing to pay, what is my client willing to
23 take.
24     MR. RUBINOFF: And that would be I think a very clear
25 answer to all your speculative questions.

**42**

1      MR. GUZZI: Well, let the witness tell me that.
2      Let's get this marked as the next one.
3      (Thereupon, the document referred to was marked as
4  Defendant's Exhibit Number 8 for identification.)
5      MR. RUBINOFF: It's the May 26th and this is June
6  16th letter that they don't have, so --
7 BY MR. GUZZI:
8   Q.   Mr. Snyder, Exhibit 8 is a May 26, 2004 letter from
9 Liberty Mutual to yourself. Do you see it?
10  A.   Yes. Can I read it for a second?
11  Q.   Yes, absolutely.
12  A.   Okay.
13  Q.   Have you had a chance to read it?
14  A.   Yes.
15  Q.   And in that letter, it's basically Liberty Mutual
16 advising you that the insureds were refusing to complete that
17 affidavit; correct?
18  A.   Correct.
19  Q.   And you received this letter?
20     MR. RUBINOFF: He received the letter.
21 BY MR. GUZZI:
22  Q.   It's in here somewhere. Do you recall receiving that
23 letter?
24  A.   Yes.
25  Q.   What did you do when you received this letter?

**43**

1   A.   I think we sent them a letter. This letter is dated
2  May 26, and I think they were sent a letter June 16th in
3  response.
4   Q.   And when you say they were sent a letter, who are you
5  referring to?
6   A.   Liberty Mutual.
7      MR. GUZZI: Okay. Let's mark that letter as Exhibit
8  9.
9      THE WITNESS: Do you have that letter?
10     MR. GUZZI: Yes.
11     MR. RUBINOFF: Yes.
12     It's probably just been misplaced in the file,
13 because everybody has copies of it if it's not in there.
14     MR. GUZZI: Next one.
15     (Thereupon, the document referred to was marked
16 Defendant's Exhibit Number 9 for identification.)
17 BY MR. GUZZI:
18  Q.   Okay. Mr. Snyder, we've marked as Exhibit 9 a June
19 16, 2004 letter from you to Liberty Mutual. Do you see that?
20  A.   Correct.
21  Q.   And you wrote that letter --
22  A.   Yes.
23  Q.   -- and sent it to Liberty Mutual?
24  A.   Yes.
25  Q.   Okay. And it's pretty self-evident, but generally,

**44**

1 what's the purpose of that letter?
2   A.   Purpose of the letter? Well, I guess I was surprised
3 that ---
4      MR. RUBINOFF: Hold on a second.
5      (Thereupon, there was a brief interruption, after
6  which the following proceedings were held.)
7      MR. RUBINOFF: What's the question, that it's pretty
8  self-evident? The answer is yes or no?
9 BY MR. GUZZI:
10  Q.   What's the purpose of that letter?
11     MR. RUBINOFF: Oh.
12     THE WITNESS: To convey to Liberty Mutual their
13 responsibility in their insureds to get this completed, so
14 try to see if we can resolve the case.
15 BY MR. GUZZI:
16  Q.   Between the time that you received Exhibit 8, which
17 is the letter from Liberty Mutual telling you that the insureds
18 weren't signing, until the time that you sent Exhibit 9, three
19 weeks or so in there, do you recall whether you had any
20 conversations with Liberty Mutual about the affidavits and what
21 was going on?
22  A.   I don't believe so.
23  Q.   Okay. Your response was basically, write this letter
24 back and send it to Liberty --
25  A.   I believe so.

---

12 (Pages 45 to 48)

45

1  Q.  -- okay. Exhibit 9?
2  A.  Yes.
3      MR. RUBINOFF:  Here, we've got a copy here, so you
4  don't have to stand up.
5      MR. GUZZI:  Okay.  Great.
6  BY MR. GUZZI:
7  Q.  Now, in Exhibit 9, the June 16 letter, you say that
8  basically it's unfortunate your clients didn't answer the
9  affidavits, Liberty didn't specify what parts of the affidavits
10 it believed to be improper, clients didn't answered the items
11 they did not object to and that you find every request
12 reasonable under the circumstances.  Do you see that?
13 A.  Yes.
14 Q.  Now, was it your understanding that Liberty Mutual
15 believed these affidavits were somehow improper?
16     MR. RUBINOFF:  Object to the form.
17     THE WITNESS:  Well, I'm considering Liberty Mutual
18 and the Clinches as one.
19 BY MR. GUZZI:
20 Q.  Why is that?
21 A.  Because they represent them.
22 Q.  When you say represent, what do you mean?  I mean,
23 they're not their attorney.
24 A.  Well, they're in a fiduciary relationship.  They're
25 supposed to stand up and protect their insureds.  They are

46

1  supposed to explain these things.  They know policies and
2  procedures and why we're doing these things.
3  Q.  Now, at this point, you don't have any knowledge of
4  any communications that are going on between the Clinches and
5  Liberty Mutual other than what Liberty Mutual may be advising
6  you; right?
7  A.  Correct.
8  Q.  And so when you say you did not specify which parts
9  of the affidavits you believe to be improper, you sort of
10 lumped Liberty and the Clinches in the same boat?
11 A.  No, because actually the letter, May 26, was not
12 written by the Clinches.  It was written by Brigitte Klein.  So
13 she's writing me a letter telling me that these affidavits --
14 that the insureds find these affidavits very invasive which
15 they're basic affidavits.  With her experience, she should know
16 these are basic affidavits.  Then she goes on to say they're
17 extremely personal financial information which is, again, basic
18 information.  She says it has nothing to do with the assets.  I
19 don't understand that.  She says if you're willing to answer,
20 but she doesn't say what's wrong with the affidavits.  These
21 are so basic.
22 Q.  Okay.  Well, the letter, Brigitte Klein's letter of
23 May 26, which is Exhibit 8, says that our insureds find the
24 affidavits very invasive; correct?
25 A.  Correct.

47

1  Q.  It doesn't say Liberty Mutual finds the affidavit or
2  finds the affidavits invasive; does it?
3  A.  No, her letter says our insureds, but, and maybe I'm
4  assuming wrong, she would have explained to the insureds that
5  this is very basic information and necessary information in
6  order to resolve the lawsuit.  So I don't know what their
7  conversations were.  I can't tell you that.
8  Q.  Right.  Okay.  All you know is about any ---
9  A.  But I know that she wrote this letter, so I'm
10 assuming that they've had some kind of extensive conversations
11 back and forth about the affidavit and the importance of it.
12 Q.  And at this point the only knowledge you have of any
13 conversations that may have happened between Liberty Mutual and
14 the insureds is what is expressed in this letter; correct?
15 A.  Correct.  That's the only information I have.
16 Q.  And the letter, again, says that our insureds find
17 these affidavits very invasive; right?
18 A.  Correct.
19 Q.  It doesn't say Liberty Mutual finds this very
20 invasive; does it?
21 A.  No.
22 Q.  Okay.  But for you somehow -- explain to me how they
23 are lumped together when you view this.  Explain to me what you
24 said before about how this is Liberty having objections to the
25 affidavit.

48

1  A.  I don't think I said that Liberty personally had
2  objections to the affidavit.  What I'm saying is in her letter,
3  Ms. Klein does not specify what is wrong with her affidavit.
4  She just makes a blanket statement that it's very invasive, and
5  with her experience, I am assuming, and I know you're not
6  supposed to assume, that she knows that this is very, very
7  basic.  It's not even the standard divorce affidavit.
8      It's very basic information; your name, an address,
9  what do you have in your account.  I mean, this is very basic
10 information.  So for her to write back and say that this is
11 very invasive or the insureds think it's invasive, I have no
12 idea what their conversations were about it.
13 Q.  Right.  Okay.  Fair enough.  But what I'm trying to
14 ask you here is that in your June 16 letter, which is Exhibit
15 9, the second sentence says, "You," meaning Brigitte Klein or
16 Liberty Mutual, "did not specify which parts of the affidavits
17 you believe to be improper and your clients did not even answer
18 the items which they did not object to."  So you're making a
19 distinction between you, as in Liberty Mutual or Brigitte
20 Klein, and the clients, as in the Clinches.
21 A.  Well, I think it's self-explanatory.  Number one, it
22 says, "You did not specify which parts of the affidavits you
23 believe to be improper," which means her representing them.
24 She didn't come back and say which specific items on the
25 affidavit was offensive to the Clinches, and number two, if

49

1 only certain items were offensive, the Clinches, they didn't
2 go ahead and fill out the items that were not offensive.
3    Q.   Okay.  So if I understand you here, your concern is
4 that the letter that Ms. Klein is writing doesn't specify which
5 parts of the affidavits the Clinches believe are improper.
6    A.   Correct.
7    Q.   Okay.  And then the Clinches didn't answer the items
8 that they did not object to; right?
9    A.   Correct.
10   Q.   Okay.  So I think guess --
11   A.   so ---
12   Q.   Go ahead.
13   A.   No, go ahead.
14   Q.   All right.  So what you would have liked to have
15 seen, if I'm correct here, is a letter, if they had this
16 information, it would have said something else along the lines
17 of these specifically are the questions that they have a
18 problem with and they've completed the parts that they don't
19 find objectionable.
20        MR. RUBINOFF:  Objection to the form, speculative.
21        THE WITNESS:  I would have liked them to tell me
22   specifically what particular matters they had a problem
23   with, so that we could address them and possibly see if we
24   could resolve it, to verify the assets.  That was the only
25   goal, to verify the assets.

50

1 BY MR. GUZZI:
2    Q.   If the insureds simply refused to sign the affidavits
3 period, would you still expect Liberty Mutual to return an
4 affidavit that had some of the questions completed?
5        (Thereupon, there was a brief telephonic
6   interruption, after which the following proceedings were
7   held.)
8        MR. RUBINOFF:  Go ahead.  I'm sorry.
9        THE WITNESS:  That depends on your question.  If
10   you're saying to me -- because I'm trying to understand
11   your question.  If you're saying to me that they said, I
12   won't answer, let's say one, two, three and but I'm going
13   to answer four, five, six, and I'll sign the affidavit, I
14   would expect Ms. Klein to send it back that way with an
15   explanation.
16        If they said, I don't care, we just refuse to sign
17   anything and we refuse to do anything and not cooperate in
18   any way, then of course, I wouldn't expect Liberty Mutual
19   to send me something that their clients, you know, have
20   absolutely refused to do, assuming, you know, that they
21   were given the proper information and understanding of
22   what was involved.
23 BY MR. GUZZI:
24   Q.   Assuming the insureds said, I'm just not going to
25 complete this affidavit, it's just not going to happen because

51

1 I find it too invasive and I just am not going to do it ---
2        MR. RUBINOFF:  Let me object to the hypothet as being
3   really speculative, because what you're doing is in your
4   hypothet you're raising a comment by one party, but it's
5   so incomplete as it relates to what was told to the
6   Clinches, what transpired, what options they were given
7   and on and on and on, so you know, it's not even close to,
8   you know, a hypothet that really can be answered with any
9   degree of responsiveness.  I mean that.  You know, I'm not
10   trying to make a speech here, you know, assuming this,
11   assuming that.
12        The questions are what was, you know, told.  You are
13   not even saying what was told to them and what they said,
14   what options were given to them, you know, and they still
15   refused or whatever.  Really, you know, I mean, you're
16   asking almost an impossible question.
17        MR. GUZZI:  Ed, I'm asking a question.  If he can't
18   answer it, he won't answer it.
19 BY MR. GUZZI:
20   Q.   Do you remember what my question was?
21   A.   No.
22   Q.   Okay.  Let's assume that the insureds basically said,
23 I'm just not going to sign this affidavit for whatever reason
24 that they may have had, okay.  Assume that that's the case.  If
25 that's the case, would you expect Brigitte Klein to write back

52

1 to you and say here are the specific questions that they object
2 to or here is the portions of the affidavit that they are
3 willing to complete?
4        MR. RUBINOFF:  Object to the form, you know,
5   incomplete hypothet, speculative.
6        THE WITNESS:  I don't know.  I don't know what she's
7   going to say.  I don't know if she said -- because she
8   would then I would assume maybe tell me what she thought
9   why they wouldn't sign it, what was the logic or reason,
10   you know, for why they wouldn't want to get out of a
11   situation like this.  I don't know.
12 BY MR. GUZZI:
13   Q.   Okay.  Now, looking at Exhibit 9, which is the June
14 16 letter --
15   A.   Right.
16   Q.   -- now, you're basically saying here once you
17 received Liberty Mutual's letter that says the insureds weren't
18 willing to complete the affidavits, your response is that we
19 think that this is all reasonable and that they should do it.
20 Fair summation of your position at that time?
21   A.   I think that's a pretty fair summation, that I
22 couldn't understand what was going on, because to me it was a
23 very reasonable, fair request to try to resolve this matter.
24   Q.   In your June 16 letter --
25   A.   Yes.

53

1  Q.  -- or any other time, did you ever forward to Liberty
2 Mutual an alternate affidavit of any type that would have
3 satisfied you?
4  A.  No.
5  Q.  Why not?
6  A.  Because at this point when you're trying to be
7 extremely reasonable and then somebody comes back and they
8 don't give you an answer why and the fact that Ms. Klein is
9 representing her insureds in such a significant situation,
10 there's nothing for me to respond to.
11  Q.  Well, in Exhibit 8, Ms. Klein's May 26, 2004 letter,
12 she specifically references a suggestion that if you're willing
13 to amend the affidavits, then she will forward it unto the
14 insureds.  You see that in her letter?
15  A.  Yes, but she doesn't tell me what was particularly
16 invasive, she doesn't tell me what the problems were, and
17 again, the affidavit to begin with -- it wasn't like we sent
18 her a 40-page -- the information we probably asked might be
19 less than what's on a loan application.  So you know, it was
20 very basic information,
21      I didn't know whether she said, well, maybe if we
22 give you an affidavit without his name on it or give an
23 affidavit without the correct address -- I wouldn't know.
24      Can I use the rest room for a second?
25  MR. RUBINOFF:  Of course.

54

1      MR. GUZZI:  Yes.
2      (Thereupon, a brief recess was taken, after which the
3  proceedings were held:)
4 BY MR. GUZZI:
5  Q.  So at this point, your position is our affidavit is
6 reasonable, the insureds should complete that one?
7  A.  Correct.
8  Q.  Do you ever indicate to Liberty Mutual that given the
9 fact that the insureds are not willing to sign the affidavits
10 that you sent over, for whatever reason, that you are willing
11 to take or look for less information than what is on the
12 affidavit that you sent over?
13  A.  Not unless they told me what the issue was.
14  Q.  Okay.  And in your June 16 letter about halfway down,
15  it says, "If your insureds still refuse to answer and
16  execute the affidavits, then your company should tender the
17  policy limits without obtaining a release due to your
18  insureds' failure to follow your instructions."
19      Do you see that?
20  A.  "If your insureds still refuse to answer and execute
21  the affidavits, then your company should tender the
22  policy limits without obtaining a release due to your
23  insureds' failure to follow your instructions."
24  Q.  Do you see what I'm referring to?
25  A.  Yes.

55

1  Q.  And so at this point you've already said we think
2 that these affidavits are reasonable; right?
3  A.  Correct.
4  Q.  And the alternative is that either the insureds need
5 to fill out these affidavits or else Liberty needs to tender
6 the policy limits without obtaining a release?
7      MR. RUBINOFF:  Object to the form, incomplete.  It
8 also says ---
9      MR. GUZZI:  No, no.  That's my question.
10      THE WITNESS:  Well, that's what it says.  It says,
11 "If your insureds still refuse to answer and execute the
12 affidavits ---"
13      MR. RUBINOFF:  Read back the question.
14      (Thereupon, the question referred to was read by the
15 reporter as above recorded.)
16      THE WITNESS:  Well, I mean, I don't know, because if
17 upon further review of the affidavit, we find every
18 request reasonable -- so I didn't know what else to do.  I
19 didn't know what else to say.
20 BY MR. GUZZI:
21  Q.  Okay.  But that's not my question.  My question is
22 this:  According to your letter, what your position is, is
23 that, A, you find every request reasonable under the
24 circumstances; right?
25  A.  I'm sorry?

56

1  Q.  Your letter specifically said that we find every
2 request reasonable under the circumstances.
3  A.  Correct.
4  Q.  That's what the letter says.
5  A.  Correct.
6  Q.  And that's what your position is --
7  A.  Correct.
8  Q.  -- the information in the affidavits is reasonable?
9  A.  Correct.
10  Q.  And your position at this point is either the
11 insureds need to complete the affidavits that you had already
12 submitted that you believe to be reasonable, or else, if the
13 insureds refused to answer and execute those affidavits, then
14 Liberty should tender the policy limits without obtaining a
15 release?
16  A.  Correct.
17  Q.  At the bottom of the first paragraph, it says
18 essentially that if Liberty instructed the Clinches not to
19 complete the affidavits, then Liberty is responsible for bad
20 faith, et cetera.  Do you see where I'm referring to?
21  A.  "If it is your company that has instructed your
22  clients to not complete the affidavits, then your company
23   will be held responsible," yes.
24  Q.  At this point, did you have any information
25 whatsoever with respect to whether Liberty Mutual was

57

1 instructing the Clinches not to complete the affidavits?
2    A.   I had to believe something was wrong, because I could
3 not imagine that someone under these circumstances, if they
4 were properly instructed by an insurance company and understood
5 all the ramifications, would not want to sign this; and if
6 there was some exceptional thing, maybe something that I can't
7 even think of that would be very -- whatever it may be -- I
8 don't know why they didn't try to resolve this or work it out
9 and just say, no, I don't care, we'll just go to trial, and we
10 don't care what the results are.
11   Q.   You thought something seemed odd --
12   A.   Yes.
13       -- correct, that the insureds wouldn't complete these
14 affidavits?
15   A.   Something seemed odd that the insurance company for
16 whatever reason didn't make an effort to either express what
17 the particular problem was or spend the time to explain these
18 things to the insureds so that they would cooperate and sign
19 the affidavits.
20   Q.   But do you have any knowledge at this point what the
21 extent of the Liberty Mutual conversations with its insureds
22 were?
23   A.   No.
24   Q.   So you're guessing maybe they instructed the Clinches
25 not to sign the affidavits, it's one possibility?

58

1    A.   Let me give you an example.
2    Q.   Sure.
3    A.   Somebody walks out into the street in front of a
4 truck that's going to kill him, and to think that the other
5 person who is with him wouldn't say, don't do that, don't walk
6 out into the street, I would feel that -- I wouldn't have to
7 guess. I would think that something was unreasonable.
8    Q.   But at this point you don't have any specific
9 knowledge of what the conversations were.
10   A.   No.
11   Q.   You're just kind of guessing.
12   A.   I would give you the same answer I gave before.
13   Q.   Okay. Turn to the second page of Exhibit 9, the June
14 16, 2004 letter. Now, here you say that you're granting an
15 extension of ten days for the Clinches to complete and execute
16 the financial affidavits; right?
17   A.   Yeah.
18   Q.   So you were giving them a last chance in case they
19 change their minds?
20   A.   Giving them another opportunity to try to -- if they
21 had not communicated in a correct way with the client, to
22 either get with them and explain things so that he could
23 understand what's going on, for his benefit as well as the
24 benefit of my client, yes.
25   Q.   So it's a ten-day extension, maybe they will sign the

59

1 affidavits?
2    A.   Right, or my example, hopefully someone was not going
3 to walk in front of a truck or a bus, yeah.
4    Q.   And if the Clinches still refused to do so, then
5 you're demanding that Liberty Mutual tender the policy limits
6 within those ten days; correct?
7    A.   Correct.
8    Q.   And no where in this letter do you say, here is an
9 alternate affidavit or here is alternate information that I'm
10 looking for or anything like that; correct?
11       MR. RUBINOFF:   I object to the form of that question.
12       THE WITNESS:   Well, we mentioned in the letter you
13       did not specify which parts of the affidavits you believe
14       to be improper, please tell us. So until we have that
15       information, there's no way we can amend or send the new
16       affidavit.
17 BY MR. GUZZI:
18   Q.   Okay. Well, the letter doesn't say please tell us;
19 does it?
20   A.   Yes. It says you did not specify which parts of the
21 affidavits you believe to be improper.
22   Q.   Okay. Where does it say please tell us?
23   A.   Well, I think that's implied; isn't it?
24   Q.   But the letter doesn't say please tell us.
25   A.   No, didn't write it in, correct.

60

1    Q.   Now, would you agree with me at this point that you
2 had this ten-day extension that you've granted, at this point
3 it ultimately is out of Liberty Mutual's hands as to whether
4 the insureds ultimately will agree to sign and execute and
5 return the affidavits?
6        MR. RUBINOFF:   Object to the form of the question.
7        THE WITNESS:   Absolutely false.
8 BY MR. GUZZI:
9    Q.   Okay. Why is that false?
10   A.   Because it would be up to Liberty Mutual to sit down
11 and explain to the Clinches the necessity of signing such an
12 important document to resolve a case of this significance and
13 it would be up to Liberty Mutual to try to do everything to
14 help their insureds understand all the consequences of not
15 doing it and given that, if things, in my mind, were explained
16 in that way, unless the Clinches were out for a suicidal
17 mission, I can't imagine them not complying in some degree.
18       MR. GUZZI:   I'm sorry. Can you read my question?
19       (Thereupon, the question referred to was read by the
20       reporter as above recorded.)
21 BY MR. GUZZI:
22   Q.   The ultimate decision as to whether an affidavit, the
23 affidavit that you had requested, was going to be executed
24 ultimately is up to the Clinches; right?
25   A.   Correct.

61

1  Q.   And so it's your belief and my understanding of your
2  testimony that Liberty Mutual has some type of obligation for
3  communication and explanation and that sort of thing; right?
4  A.   To inform their insureds, absolutely.
5  Q.   Okay.  But ultimately, let's assume that Liberty
6  Mutual explains it as no person has ever explained it before
7  and the insureds completely understand everything but they
8  still refuse to sign it.
9       MR. RUBINOFF:  Object to the form.
10 BY MR. GUZZI:
11 Q.   That's still a decision that the Clinches are making;
12 right?
13 A.   If you are telling me from your hypothetical that
14 Liberty Mutual did everything possible to sit down, explain,
15 inform the Clinches everything that occurred and the Clinches
16 simply were on a suicidal mission to say we want a big judgment
17 against us, want to go bankrupt, we don't care, we're crazy,
18 we're insane, you're right, then Liberty Mutual -- I would
19 agree with you.
20 Q.   There's nothing they can do about it?
21 A.   Nothing they can do under those circumstances.
22 Q.   And they can't comply with what your settlement
23 demands have been?
24 A.   Correct.
25 Q.   And at this point in June, your settlement position

62

1  is that you will not settle the case for the policy limits in
2  exchange for a release without obtaining the affidavits?
3  A.   I believe that's what it says.
4  Q.   Well, I want to make sure what your settlement
5  position was at that point.
6  A.   We need to verify assets.
7  Q.   And so at this point if you don't have an affidavit,
8  then you're not going to settle for the $25,000 policy limits?
9  A.   If I'm not able to verify assets, I would not be able
10 to get this approved by the Court which is a minor settlement.
11 The Court would not accept it.
12 Q.   And you wouldn't recommend it?
13 A.   And I wouldn't recommend it.
14 Q.   Have you been made aware at any point as to the
15 substance of any communications that may have occurred between
16 Liberty Mutual and the Clinches?
17 A.   No.
18 Q.   Okay.
19 A.   I don't think so.
20     MR. RUBINOFF:  Other than what was communicated in
21 the letters.
22     MR. GUZZI:  Right, other than what was communicated
23 in the letters.
24     THE WITNESS:  I don't think so, no.
25 BY MR. GUZZI:

63

1  Q.   So you haven't spoken with anybody at Liberty Mutual
2  about what they communicated with the Clinches?
3  A.   I don't recall.
4  Q.   And you haven't read any deposition testimony from
5  this case?
6  A.   No.
7  Q.   And you haven't reviewed any documents that have been
8  produced in this case?
9  A.   I think possibly the note that you showed me.
10 Q.   Okay.  But before today?
11 A.   Maybe that note.  I don't recall.
12 Q.   Well, if a note like this, a claim note here -- is
13 this what you --
14     MR. RUBINOFF:  The one with Scarborough?
15     MR. GUZZI:  Yeah, hold on.  Off the record.
16     (Thereupon, a brief recess was taken, after which the
17 proceedings were held:)
18     MR. GUZZI:  On the record.
19     Exhibit 2, part of the page stuck to the table and it
20 ripped off the date.  So I'm just writing in a three for
21 January 23rd where it got ripped off, so it's clear.
22 BY MR. GUZZI:
23 Q.   Mr. Snyder, I'm talking about Exhibit 4, this claim
24 note, is this what you're referring to that maybe you've seen
25 at some point?

64

1  A.   I believe maybe we had discussed it or the
2  conversation, if I had a conversation, something to that
3  effect.
4     MR. RUBINOFF:  I think what the reality is, I
5  mentioned what was in that note.  That's why it's sounding
6  familiar to him.
7  BY MR. GUZZI:
8  Q.   Any other claim notes that you discussed or may have
9  seen or reviewed?
10 A.   No.
11 Q.   Let me ask you something:  From what you do know or
12 have seen, do you believe that Liberty Mutual was somehow
13 improper in the manner in which it communicated with its
14 insureds?
15     MR. RUBINOFF:  Object to the form, asked and
16 answered.
17     THE WITNESS:  Basically what we've talked about.
18 BY MR. GUZZI:
19 Q.   Okay.  Well, what you've been talking about
20 hypothetically and Liberty Mutual did this, if Liberty did that,
21 but what I haven't heard from you is what your understanding is
22 of what Liberty Mutual actually or how they communicated with
23 the Clinches and whether you believe that that's somehow
24 improper.
25     MR. RUBINOFF:  Object to the form, incomplete

65

1  hypothet.
2      THE WITNESS: Let me go back to my example.
3      If somebody has your best interest at heart and you
4  are taking a blind person across the street and you have
5  responsibility for that person and that person insists
6  upon walking in front of a bus, you have two choices.
7  Either the person that's walking them is not doing what
8  they're supposed to do or the person who wants to walk in
9  front of the bus and pushes the other person away is on a
10  suicide mission. So that's how I answer, because you're
11  asking me in the negative how would I know and I'm saying
12  I'm knowing by the responses that I'm getting from
13  Ms. Klein and her letters. They didn't make sense to me.
14 BY MR. GUZZI:
15  Q.  Okay. What is your understanding, if you have any,
16 as to what exactly were Liberty Mutual's communications with
17 the Clinches?
18  A.  I don't know what their communications are with the
19 Clinches.
20  Q.  And so any sort of opinion or thoughts that you may
21 have as to whether Liberty did or did not act properly with
22 respect to the communications with the Clinches, is just
23 speculation on your part?
24      MR. RUBINOFF: Object to the form.
25      THE WITNESS: Well, I think as to the communications,

66

1  again, I don't know what they told them but they certainly
2  didn't convey anything to me to try to resolve it.
3  BY MR. GUZZI:
4  Q.  Well, you received these letters we've been talking
5  about; right?
6  A.  Yeah.
7  Q.  And in the letters they're advising you as to what
8  their insureds' position is; right?
9  A.  That basic information was personal which is the
10  whole definition of what an asset questionnaire is, it is
11  personal, and that they refused to sign something but they're
12  not telling me what things. So I don't know how you would
13  answer that any better than I can answer it.
14  Q.  Okay. Well, I mean, the letters -- what you know is
15  what the letters say.
16  A.  Exactly.
17  Q.  And they say what they say.
18  A.  Correct.
19  Q.  Now, during the several months when these settlement
20  negotiations and affidavits and letters and whatnot were going
21  back and forth, there were several occasions during which
22  Liberty Mutual forwarded to your office checks for the policy
23  limits and the release; right?
24  A.  Several? I think they forwarded it once. We sent it
25  back. I don't remember if it was more than once, maybe twice.

67

1  Q.  But you do recall this happening?
2  A.  Yes.
3  Q.  And you obviously didn't accept --
4  A.  No.
5  Q.  -- the settlement check, the check as settlement?
6  A.  Correct. They sent a general release that we have to
7  waive all rights and claims which anyway we couldn't sign the
8  release, because that would have to be approved by a Court
9  because ---
10      MR. RUBINOFF: Just answer the question. What was
11  the question?
12 BY MR. GUZZI:
13  Q.  The question was that you never accepted it as a
14 settlement.
15  A.  Correct.
16  Q.  Okay. And what was the reason for it?
17  A.  We don't know what the assets are.
18  Q.  And in order to accept any settlement and sign a
19 release, you would need Court approval?
20  A.  Correct.
21  Q.  In Exhibit 9, the January -- I'm sorry -- the June 6,
22 2004 letter ---
23      MR. RUBINOFF: June 6 or 16?
24      MR. GUZZI: I'm sorry. Thank you. June 16, Exhibit
25  9.

68

1 BY MR. GUZZI:
2  Q.  On Exhibit 9 you reference a couple of times that you
3  demand that Liberty Mutual tender the policy limits without a
4  release; correct?
5  A.  Correct.
6  Q.  And why are you demanding Liberty Mutual do that?
7  A.  Well, I guess that would be one viable option, that
8  if they at least tendered a policy and then we would have to
9  guess litigate to find out what the assets are, bring it to the
10 authorities' attention to determine what that is and still
11 leave the option open to get more if we can't get simple
12 answers addressed.
13  Q.  Well, do you expect Liberty Mutual to pay the $25,000
14 policy limits before judgment was entered or without getting a
15 release?
16  A.  I don't know. They would need to speak to their
17 insureds about what they want to do.
18  Q.  When Liberty Mutual forwarded the checks for the
19 $25,000, you said you ultimately returned them; right?
20  A.  Correct.
21  Q.  And you said basically -- well, let me show you.
22      MR. GUZZI: Okay. Let's mark these as Exhibits 10
23  and 11.
24      (Thereupon, the documents referred to were marked
25  Defendant's Exhibit Numbers 10 and 11, respectively, for

69

1    identification.)

2 BY MR. GUZZI:

3    Q.   Mr. Snyder, I'm showing you what's been marked as
4 Exhibits 10 and 11 which are the two.  I think it's July 29th
5 and another one in December of '04; is that right?

6    A.   Um-hmm.

7    Q.   Okay.  And those are the letters from your office
8 returning the settlement check; right?

9    A.   Um-hmm.

10   Q.   And your position basically is we're not taking
11 $25,000 in exchange for a release; right?

12   A.   Correct, because we don't have assets.

13   Q.   And that's we can't take the $25,000 if you're going
14 to condition it upon a release?

15   A.   Without an asset check, right.

16   Q.   Were there any other concerns?  Were there any other
17 issues that were holding up settlement?

18       MR. RUBINOFF:  Object to the form.  I don't know what
19   you mean.

20 BY MR. GUZZI:

21   Q.   Other than you mentioned you need to -- let me start
22 over.

23       The testimony has been that before you could settle
24 for $25,000, you needed to get an asset affidavit; correct?

25   A.   Correct.

70

1    Q.   Were there any other issues or concerns on the table
2 that needed to be addressed before any settlement proposal
3 could be finalized?

4    A.   You mean with Liberty Mutual?

5    Q.   Yes.

6    A.   I don't recall, no.

7        MR. RUBINOFF:  You're talking about asset check,
8    confirmation and follow-up --

9        MR. GUZZI:  Yes.

10       MR. RUBINOFF:  -- that he's been talking about;
11   right?

12       MR. GUZZI:  Yes, yes.

13 BY MR. GUZZI:

14   Q.   If the insureds had provided you with an affidavit
15 that was different than the detailed affidavit --

16       MR. RUBINOFF:  We know which one you're talking
17   about.

18   Q.   -- that's Exhibit 7, how much detail would you have
19 required in order to have the affidavits be deemed acceptable?

20       MR. RUBINOFF:  Object to the form.

21       THE WITNESS:  Well, I would basically want
22   essentially the information that's on there unless -- I
23   don't know -- something was -- which even today I don't
24   know what is so objectionable.

25       If there was something that, for instance, was so

71

1    objectionable about a date of birth for whatever reason or
2    an origin of a country but he was willing to, let's say,
3    tell us, you know, or give us verified bank accounts or
4    give us real estate information, give us stocks and bonds,
5    so that basically we can verify what the actual assets are
6    and we could sit down and start talking about what maybe
7    they can afford or can't afford or what they're willing to
8    do or what they're not willing to do, then I think we
9    would be open to that.

10 BY MR. GUZZI:

11   Q.   Let's take a look at Exhibit 7.  That's the detailed
12 affidavit.

13       Okay.  Now, you've testified a number of times
14 already that ---

15   A.   You keep saying it's a detailed affidavit.  I
16 referred to this as a basic affidavit.

17   Q.   Well, when I say, just for explanation, detailed, I
18 mean it's more detailed that the first affidavit that they did
19 sign.

20   A.   Correct.

21   Q.   That's why I used the word detailed.  I don't mean it
22 in any other way.

23   A.   Okay.

24   Q.   Looking at Exhibit 7, you've now testified several
25 times that you found every request, every request or

72

1 information in this affidavit to be reasonable; yes?

2    A.   Okay.

3    Q.   Okay.  Looking at the affidavit, okay, if the
4 insureds had submitted an affidavit that was completed and
5 notarized and executed, okay, that had some but not all of the
6 information that's in this affidavit, point to me which items
7 in this affidavit you would have been okay with if they were
8 not included?

9        MR. RUBINOFF:  Object to the form.

10       MR. GUZZI:  Do you understand my question?

11       THE WITNESS:  Yes.

12       Maybe the names and ages of their children.  If we
13   verified the assets, I might not really care what their
14   date of birth is or place of birth if we could verify it
15   in some other way.

16       So in other words, if they produced a bank account --
17   well, it's hard to say because we wouldn't know unless we
18   did an asset search and we would need this information for
19   an asset search to also verify that there are no other
20   bank accounts or assets.  So I don't know.  We have to
21   take it on a case-by-case basis, and we have to know the
22   reason for their -- why they found it offensive, that
23   particular part.

24 BY MR. GUZZI:

25   Q.   Well, when you had this affidavit, everything that's

73

1 in there you need for some reason; right?
2     MR. RUBINOFF: Object to the form.
3     THE WITNESS: Yeah, I would say so.
4 BY MR. GUZZI:
5   Q.   Yeah, I mean, I believe you said before when we were
6 discussing this that everything is somehow related to their
7 assets or your ability to verify their assets.
8   A.   Right. I mean, I don't want to stand here and go
9 through this, because you can read this as well as I can and
10 anybody can read this and you see what's here. You want me to
11 take it step-by-step and say, do I need to know the person's
12 name?
13   Q.   Well, let me ask you this: I mean, you, obviously,
14 don't need information like what's your mother's maiden name,
15 you don't need something like that, or what your mother's
16 middle name is. That type of information wouldn't be important
17 to you; right?
18   A.   Not necessarily, no. I don't see it here.
19   Q.   No, no, I'm not saying it's in here.
20   A.   Okay.
21   Q.   I'm just saying as a hypothetical question.
22   A.   All right.
23   Q.   But the information that is on there, you deem to be
24 reasonable, if nothing else, in order for you to be able to
25 verify assets.

74

1     MR. RUBINOFF: Object to the form.
2     THE WITNESS: Well, for instance, if he said to me
3 I'm working for -- like my client -- homeland security and
4 I'll tell you my salary, but as to my duties, it's
5 confidential, I can't tell you what I do for the
6 government, I can probably live with that. I think my
7 client can probably live with something like that.
8 BY MR. GUZZI:
9   Q.   Okay. Tell me what else.
10     MR. RUBINOFF: Object to the form.
11     THE WITNESS: I don't know what else because ---
12 BY MR. GUZZI:
13   Q.   Is there anything else that you could have lived
14 without having?
15     MR. RUBINOFF: Object to the form. It's speculative.
16     THE WITNESS: I don't know, because I'd have to see
17 how it could be modified in another way. I'd have to find
18 out what they found offensive.
19 BY MR. GUZZI:
20   Q.   But you can't sit here and tell me which things would
21 have been okay for you not to have and still would have been
22 acceptable?
23     MR. RUBINOFF: Object to the form.
24     THE WITNESS: Again, my answer would be the same.
25 BY MR. GUZZI:

75

1   Q.   And that's no?
2   A.   No. My answer is I don't -- I would need to know
3 what the specific objection is and what the specific purpose is
4 to see how it might be modified or changed.
5   Q.   But why do you need to know what the specific
6 objection would be? My question is ---
7   A.   Because, I'm trying to find assets. So for instance,
8 if you said to me, okay, I don't want to tell you how much land
9 I own, what real property I own. I need to know why.
10   Q.   Why do you need to know why?
11   A.   Well, because maybe there's another way. We need to
12 know if there are other ways of getting information. Maybe
13 they don't want me to have the address of the land. You're
14 willing to give me the financial information on the property,
15 but you don't want to disclose a particular address for some
16 reason and we can verify that that is true, the piece of
17 property, then maybe we'd accept that and not, you know, need
18 to have that address if it's verified.
19   Q.   Well, in that example, how can you know whether
20 somebody owns or what the value of a piece of property is if
21 you don't have the address of the property?
22     MR. RUBINOFF: Object to the form.
23     THE WITNESS: No, I'm saying -- because let's say,
24 for instance, we had a situation where -- because you're
25 asking me hypothetical questions, so I'm just saying

76

1 maybe if they produced information that we verified was
2 true from the bank but they whited out, you know, the
3 actual address, but all the other information was true and
4 correct, it did come from the bank or come from some other
5 kind of reputable source, maybe it could be accepted. I
6 don't know. I wouldn't know. I would have to know why,
7 you know, they would make an objection to something in
8 order for me to then determine how important is that
9 objection or how important that information is or how
10 important is it to get it verified.
11 BY MR. GUZZI:
12   Q.   But if your position is that you need to be able to
13 know the total assets that the Clinches have, how is it
14 relevant or why is it important to you as to what the basis of
15 the objection is?
16   A.   Because maybe there's a way that we could work with
17 them or their sensitivities and still be confident and secure
18 enough that we can go in front of a judge and tell the judge
19 we're confident that these are the assets of the Clinches and
20 the judge would accept that as reasonable.
21   Q.   But regardless of what the basis of the objections
22 are, the reasons for them, you still want to know what all of
23 their assets are; right?
24     MR. RUBINOFF: Object to the form.
25     THE WITNESS: I'd want to know what the assets are,

77

1  yes. I don't know how else to answer your question.
2        MR. GUZZI: Okay.
3        MR. RUBINOFF: Getting close?
4        MR. GUZZI: Yes.
5        (Thereupon, a brief discussion was held off
6  the record, after which the following proceedings
7  were held.)
8        MR. GUZZI: Okay. Let's mark this as the next
9  exhibit. What are we on, 12?
10       (Thereupon, the document referred to was marked
11  Defendant's Exhibit Number 12 for identification.)
12 BY MR. GUZZI:
13  Q.  Mr. Snyder, we've marked as Exhibit 12 the
14 Defendant's First Request For Admissions and then the
15 plaintiff's responses.
16       Now, first of all, have you seen these requests or
17 these responses before today?
18  A.  Yes.
19  Q.  When did you see them?
20  A.  I think when we had to review them to fill them out
21 or to respond to them.
22  Q.  Did you play a role in responding to these?
23  A.  Yes.
24  Q.  And what role did you play?
25  A.  Asking me the factual questions, whether we admit or

78

1  deny certain things to the best of my knowledge.
2  Q.  Okay. And starting at Exhibit 13 --
3        MR. RUBINOFF: Which is 13?
4        MR. GUZZI: I'm sorry, request 13.
5  BY MR. GUZZI:
6  Q.  The request is, "Admit that you were unwilling to
7  release the Clinches upon tender of the Clinches' $25,000
8  policy limits and receipt of the affidavits attached as
9  Exhibit 11."
10       Exhibit 11 are the original affidavits.
11       MR. RUBINOFF: Are you going to ask him whether he
12 admitted or denied it?
13       MR. GUZZI: I'm about to ask him that question.
14       MR. RUBINOFF: It's there.
15       THE WITNESS: It's there.
16 BY MR. GUZZI:
17  Q.  Let me ask my question.
18       Now, this one was admitted by the plaintiff. Okay.
19 Do you agree with that?
20  A.  Correct.
21  Q.  That's Number 13, that's a true statement?
22  A.  Correct.
23  Q.  And now Number 14 is also admitted; is that correct?
24  A.  Yes.
25  Q.  Now, Number 15 -- just for your reference, Exhibit 12

79

1  is what I've been calling the detailed affidavits.
2  A.  Okay.
3  Q.  This one is denied.
4  A.  Well, I think ---
5  Q.  Well, let me ask my question. Is denied an accurate
6  response to this request?
7  A.  Yes.
8  Q.  And why is this denied?
9  A.  Well, you just asked me. Twelve is our affidavit.
10  Q.  Right.
11  A.  Because if they would have, you know, given us the
12 information in some other manner, everything that we've
13 discussed in the last hour, we might have also agreed to
14 resolution of it. It didn't have to be that specific
15 affidavit. So the way the question is phrased, I just want to
16 be clear about that.
17  Q.  Okay. So you needed some type of affidavit; correct?
18  A.  Correct. It's not the affidavit. We needed some
19 kind of verified proof of assets.
20  Q.  Well, from the very beginning of your communication
21 with Liberty Mutual, you were asking for an asset affidavit;
22 right?
23  A.  That is the normal course of how things are done.
24 You send out a basic affidavit. I have never seen an
25 affidavit, a financial affidavit, sent the way that it was sent

80

1  to me by Liberty Mutual.
2  Q.  But my question was that from the beginning, it was
3  always phrased in terms of you need an asset affidavit.
4  A.  Correct.
5  Q.  Did you ever advise Liberty Mutual that we don't need
6  an affidavit, we just need the information in some other form?
7  A.  No.
8  Q.  Did you ever provide Liberty Mutual with an alternate
9  version of the affidavits?
10  A.  No.
11  Q.  Now, going to Number 16, this one was denied.
12       First I just want to ask you if that's an accurate
13 response.
14  A.  Yes. First of all, it's a double negative in the
15 question, so it says, admit that you're unwilling. So some of
16 these questions are a little complex in the way they're
17 phrased, but it says, admit that you were unwilling to release
18 the Clinches upon tender of the 25,000 policy limits if the
19 Clinches had other insurance, and of course, we would not admit
20 that because if they had other insurance, like an umbrella
21 policy, we wanted to take that money, too.
22  Q.  So the way that this is phrased, because it's denying
23 a negative, an accurate statement would be that you were
24 willing to release the Clinches upon tender of the Clinches'
25 25,000 Liberty policy if the Clinches had other insurance to

81

1 cover the claim?
2   A.   Correct.
3        MR. RUBINOFF:  Cover the claim, meaning full value?
4        THE WITNESS:  Full value.
5 BY MR. GUZZI:
6   Q.   Is that what you mean?
7   A.   Yes.
8   Q.   Okay.  So in your response to this or your testimony
9 here, cover to you means the full value of whatever claim it
10 would have been?
11   A.   Sure.
12   Q.   So if the Clinches had a $50,000 umbrella policy or
13 $50,000 some other type of policy, that would not have been
14 enough insurance?
15   A.   Well, then again, we'd go back to the same thing with
16 the assets, because it's not full value.  We'd have to
17 reevaluate everything.
18   Q.   How much would it have taken of other insurance for
19 you to settle the claim by taking $25,000 from Liberty and
20 other insurance to settle the claim?
21        MR. RUBINOFF:  Objection to the form, speculative.
22        THE WITNESS:  Probably in the millions.  I can't tell
23   you.  I mean, I'm not sure, you know.  At that point in
24   time, we'd have to look at everything.
25 BY MR. GUZZI:

82

1   Q.   Okay.  And then Number 18, "Admit that you were
2   unwilling to release the Clinches upon tender of the
3   Clinches' $25,000 policy limits if the Clinches had assets
4   that would have been subject to garnishment or execution,"
5   and that's denied.
6   A.   Correct.
7   Q.   And why is that denied?
8   A.   Because there might have been a situation where maybe
9   they would have something that could be garnished.  You've been
10 giving me what I call unreasonable hypotheticals.  If they had
11 a dollar or two dollars, you know, they could have money that's
12 legally garnishable, but if it just wouldn't be feasible, we
13 might not do it and take the policy.  It would depend on the
14 extent of the assets.
15        MR. GUZZI:  Next exhibit is marked as 13.
16        (Thereupon, the document referred to was marked
17   Defendant's Exhibit Number 13 for identification.)
18 BY MR. GUZZI:
19   Q.   Mr. Snyder, what's marked as Exhibit 13 is a July 13,
20 2004 letter from you to Liberty Mutual.  Do you recognize this?
21   A.   Yes.
22   Q.   And you wrote this letter?
23   A.   Yes.
24   Q.   Why don't you take a minute just to review it.
25   A.   Okay.

1   Q.   Can I take a look at it?  Sorry, it's my only copy.
2        Now, the general gist of this letter here is that
3 you're now upping your settlement demand to a million dollar,
4 right?
5   A.   I'm sorry?
6        MR. RUBINOFF:  Object to the form.  I don't know wh
7   -- had there been any prior settlement demands.  Had there
8   been?
9        THE WITNESS:  No.
10 BY MR. GUZZI:
11   Q.   Okay.  Well, then let's go through it carefully.
12        Your first sentence is, "Be advised that since you
13   and your insured failed to complete our financial
14   affidavits, we hereby withdraw our offer to settle for
15   policy limits."
16   A.   Right.
17   Q.   Was there an outstanding offer to settle for policy
18 limits?
19   A.   If we had a completed affidavit and we could agree on
20 it, we would see depending on the affidavit.  That was the
21 issue.
22   Q.   So at that point -- I want to make sure I'm clear --
23 the settlement at a minimum is we need to get an affidavit from
24 your insureds, and depending on what the affidavit says and
25 whether they have other insurance or assets, then we may take

1 the $25,000 policy limits in exchange for a release?
2   A.   Correct.
3   Q.   But that's conditioned upon getting a completed
4 affidavit; correct?
5   A.   Correct.
6   Q.   And the Clinches had originally returned an affidavit
7 that you found to be insufficient; correct?
8   A.   Correct.
9   Q.   And then you forwarded to Liberty Mutual an alterna
10 affidavit which has been marked as Exhibit 7 for the insured
11 to complete; right?
12   A.   Correct.
13   Q.   And now, here it says that the offer, whatever offer
14 to settle for policy limits, is now withdrawn, because the wa
15 you phrased it, Liberty and Liberty's insureds failed to
16 complete our financial affidavits; correct?
17   A.   Correct.
18   Q.   And when you say our financial affidavits, you're
19 referring to Exhibit 7, the affidavits that you had forwarded
20 to Liberty Mutual; right?
21   A.   Correct.
22   Q.   And then you returned the $25,000 check that Liberty
23 Mutual had previously forwarded to you?
24   A.   Correct, with their release.
25   Q.   Okay.  And now, you increase -- well, the demand is

85

1 now a million dollars; right?

2   A.   Correct.

3   Q.   And the million dollars is no longer -- there's no
4 longer a condition of asset affidavit or anything?

5   A.   Correct.

6       MR. RUBINOFF:  Note my objection to any discussion
7 about settlement.  You know it's preserved, but I'm
8 formally going to object for the record to any discussion
9 about settlement offers and ---

10      MR. GUZZI:  Well, it's kind of hard to litigate a bad
11 faith case about a failure to settle if you don't talk
12 about settlement.

13      MR. RUBINOFF:  What?

14      MR. GUZZI:  Never mind.

15 BY MR. GUZZI:

16  Q.   So at this point, the settlement is, one, if the
17 Clinches and/or Liberty Mutual pay $1,000,000, then the
18 Clinches would be released.  Is that an accurate statement?

19  A.   It's an accurate statement.

20  Q.   And there's a seven-day time limit contained therein;
21 correct?

22  A.   Correct.

23  Q.   And then at the bottom, you say that if Liberty wants
24 to avoid bad faith, it should tender the $25,000 without a
25 release.

86

1   A.   That was another option that we thought, yes.

2   Q.   Okay.  But forwarding the $25,000 is not going to
3 result in a release of Liberty Mutual's insureds; correct?

4   A.   Absolutely.

5   Q.   At most, it would be a setoff against any verdict
6 that ultimately would be entered.

7   A.   Correct.

8       (Thereupon, a brief recess was taken, after which
9   the following proceedings were held:)

10      MR. GUZZI:  Let's mark this as 14.

11      (Thereupon, the document referred to was marked
12  Defendant's Exhibit Number 14 for identification.)

13 BY MR. GUZZI:

14  Q.   Mr. Snyder, I am handing you what's marked Exhibit
15 14.  It's a letter from Liberty Mutual dated July 20, 2004.
16 It's a week after you sent the million dollar demand, and
17 you'll see it's Liberty Mutual tendering the $25,000 policy
18 limits.

19  A.   Yes.

20  Q.   And your response to this letter was what?

21  A.   I don't recall.

22  Q.   Exhibit 10 is a July 29 -- maybe that's it.  I don't
23 want to speak for you but --

24  A.   Yeah, that's probably it.

25  Q.   These are two letters we've already discussed where

87

1 you're rejecting ---

2   A.   Yeah.

3   Q.   Okay.  And so at this point, it's still the million
4 dollars that you're looking for as set forth in your July 13
5 letter?

6   A.   Right.

7       MR. GUZZI:  Let's mark this as the next exhibit.

8       (Thereupon, the document referred to was marked
9   Defendant's Exhibit Number 15 for identification.)

10 BY MR. GUZZI:

11  Q.   Mr. Snyder, I'm handing you what's marked as Exhibit
12 15.  This is another one of these claim notes, and I want to go
13 over something with you and get your thoughts?

14      I want you to look at this entry right here dated May
15 26, 2004 at 9:30 a.m.  This is a claim note that Brigitte Klein
16 entered into the system.

17      First of all, have you seen this?

18  A.   I don't recall, no.

19  Q.   Okay.  Why don't you take a look at it?

20      MR. RUBINOFF:  This is a note that relates to a
21 conversation with him or --

22      MR. GUZZI:  No.  This is Brigitte Klein's note.  As I
23 understand it, it's Brigitte Klein about her conversation
24 with Mr. Clinche once Mr. Snyder sent over the more
25 detailed affidavit.

88

1 BY MR. GUZZI:

2   Q.   Did you have a chance to review it?

3   A.   Yes.

4   Q.   Do you understand some of the shorthand notes there?

5   A.   Well, I'm assuming INSD is insured and ADV must be
6 advised, but I don't know.  If there's something else, I'm not
7 sure.

8   Q.   Okay.  Fair enough.

9   A.   I don't know what CIT attorney is.  CIT attorney, I
10 have no idea what that is or maybe it's CLT, client.

11  Q.   Maybe claimant attorney.

12      Now, I think you just said you've never seen this
13 before; right?

14  A.   I don't think so.

15  Q.   Have you ever been advised as to the substance of
16 this conversation between Ms. Klein and Mr. Clinche?

17  A.   No.

18  Q.   I understand you're just reading a document, okay,
19 but based on what you see here, do you have any thoughts or
20 opinions as to the propriety of Liberty Mutual's communications
21 with Mr. Clinche?

22      MR. RUBINOFF:  Object to the form, incomplete
23 hypothetical.

24      THE WITNESS:  And I don't know anything about
25 propriety.

89

1 BY MR. GUZZI:
2    Q.   Well, do you find any fault in the manner in which
3 Liberty Mutual communicated with its insured?
4    A.   Well, this doesn't tell me how they communicated.
5 This is her note of what she wrote based upon her conclusion.
6 I don't know what she told them. I don't know how extensive
7 their conversations were. I don't know, you know. I have no
8 idea about what went on, what she's explaining to them.
9    Q.   Okay. And before today, have you been made aware
10 to what the substance of their communication was?
11    MR. RUBINOFF: That particular communication?
12    MR. GUZZI: That particular communication.
13    THE WITNESS: No.
14 BY MR. GUZZI:
15    Q.   Were you aware as to what Ms. Klein says in here as
16 to what Mr. Clinche had advised her about his unwillingness to
17 sign the affidavit and his concerns?
18    A.   Say that again.
19    Q.   Were you aware before today as to the substance of
20 what --
21    A.   No. I'm sorry.
22    Q.   -- of what Mr. Clinche's comments to Ms. Klein were
23 regarding his unwillingness to sign the affidavit?
24    A.   No.
25    MR. RUBINOFF: What is the date of that note?

90

1    MR. GUZZI: May 26, 2004.
2 BY MR. GUZZI,
3    Q.   I understand you're only reading here, but based
4 solely on here, do you think that Liberty Mutual acted
5 improperly in terms of what it advised the insureds about the
6 request for the affidavit and the ramifications of not --
7    MR. RUBINOFF: Objection.
8    Q.   -- getting it?
9    MR. RUBINOFF: Objection. You're finished? I'm
10 sorry.
11    MR. GUZZI: Yes.
12    MR. RUBINOFF: Object, incomplete hypothet and it
13 doesn't go into any of the other discussions at all and I
14 think it's impossible to answer.
15    THE WITNESS: Well, I can't answer it, because I
16 don't know, you know, what was said other than what's
17 written here which is her conclusion of apparently what --
18 you know, it's just very basic.
19    MR. GUZZI: Sorry, Ed. I just needed to flip here
20 for one second.
21    MR. RUBINOFF: I've got this note, but I want, before
22 we leave, I want to have a copy of this.
23    MR. GUZZI: Sure. Off the record.
24    (Thereupon, a brief discussion was held off
25 the record and a brief recess was taken, after which the

91

1    following proceedings were held.)
2    MR. GUZZI: I have no further questions.
3    THE WITNESS: Great.
4            CROSS-EXAMINATION
5 BY MR. RUBINOFF:
6    Q.   I have some questions, and let me go back first just
7 to clear up one little thing on this June 16th letter. I
8 believe you were asked that as of this date, your position was
9 that if they didn't fill out the affidavits you gave them, you
10 would not settle the case.
11    Now, in your letter, in the second line, you talked
12 about where you ask them to specify what part of the
13 affidavit you believe to be improper and they didn't even
14 answer the items to which they did not object to, do you
15 remember that?
16    A.   Yes.
17    Q.   Okay. So where you say your position was that unless
18 they filled out the affidavit, you wouldn't settle the case,
19 that was based on the fact that Liberty Mutual and/or the
20 Clinches were not going to specify which parts of the affidavit
21 they believed to be improper or answer any of the items;
22 correct?
23    A.   They gave no ---
24    Q.   Is that correct?
25    A.   Yes.

92

1    Q.   Now, let me go address this Exhibit 15, the notes,
2 and let me find, if I could -- there's a letter I need to see,
3 maybe you can help me, the letter where ---
4    MR. GUZZI: Off the record.
5    (Thereupon, a brief discussion was held off
6 the record, after which the following proceedings
7 were had.)
8    MR. GUZZI: Here you go, Exhibit 8. Okay. Back on.
9    MR. RUBINOFF: May 26, right.
10 BY MR. RUBINOFF:
11    Q.   Now, you've testified that the only information you
12 were provided about the reason that they wouldn't sign the
13 affidavit is that, and I'm quoting the May 26 letter, that the
14 affidavits were very invasive and it was extremely personal
15 financial information which has nothing to do with any assets.
16 Okay. They never gave you any details on May 26, that is they,
17 Brigitte Klein; correct?
18    A.   Correct.
19    Q.   As a matter of fact, when we look at this note on May
20 26, apparently the same day she wrote the letter, it says that
21 the insureds told her very specifically what they felt was
22 personal about the affidavit, and that is, quoting the note,
23 the request for bank accounts and social security numbers?
24    MR. GUZZI: Object to form.
25    THE WITNESS: Numbers to all bank accounts and social

93

1    security numbers.
2 BY MR. RUBINOFF:
3    Q.   Okay.  But she never communicated that specific
4 information to you?
5    A.   No.
6    Q.   Okay.  And had she communicated that to you, would
7 you have made an effort to communicate with her to find out if
8 there was a way to get the information you needed to meet your
9 obligation to your client in a way that would satisfy the
10 Clinches about their concern about giving out their bank
11 account numbers and social security numbers?
12   A.   Yes.
13       MR. GUZZI:  Object to form.
14 BY MR. RUBINOFF:
15   Q.   But you were never given that opportunity by Liberty
16 Mutual?
17       MR. GUZZI:  Object to form.
18       THE WITNESS:  No.
19 BY MR. RUBINOFF:
20   Q.   Now, let me just kind of sum up, you know, the
21 testimony as I understand it.  You represented the Estate of
22 Maldonado, the estate, the wife and the three children;
23 correct?
24   A.   Yes.
25   Q.   You determined that the Liberty Mutual policy

94

1 covering  the Clinches was limited to $25,000.
2    A.   Correct.
3    Q.   You wanted to confirm the existence or confirm
4 whether or not the Clinches had any assets that could satisfy
5 any judgment that you might get against them.
6    A.   Correct.
7    Q.   Or in the alternative, depending on their assets,
8 perhaps enter into some settlement with them that as you've
9 described would be reasonable for them and make sense to your
10 client even though it would not result in your client obtaining
11 full value of the damages.
12   A.   Correct.
13   Q.   And under those circumstances, of course, you
14 wouldn't want to expose your client to the cost of obtaining a
15 judgment against the Clinches that could not be satisfied in
16 any amount.
17   A.   Correct.
18   Q.   Okay.  But in order to accomplish that, you needed
19 verification of the Clinches assets; correct?
20   A.   Correct.
21   Q.   All right.  And in legal proceedings, it was your
22 understanding that the most common way that's obtained is with
23 affidavits.
24   A.   Correct.
25   Q.   Simple for the one party to prepare and the other

95

1 party to respond to.
2    A.   Correct.
3    Q.   And with the appropriate information in an affidavit,
4 then you could verify what the assets might be and then act
5 from that point as you've discussed at length.
6    A.   Yes.
7    Q.   Okay.  And when you requested an affidavit of assets
8 and insurance from Liberty Mutual, your expectation was,
9 appropriate or not, that you would get a detailed list of the
10 assets since it was obvious why you were looking for that
11 information.
12   A.   Correct.
13       MR. GUZZI:  Object to form.
14 BY MR. RUBINOFF:
15   Q.   Then you got back the affidavit that they prepared,
16 which as you've talked about, was inadequate for the purpose
17 you intended.
18   A.   Yes.
19   Q.   Okay.  And as you've testified, it wasn't really how
20 you got the information regarding assets that was important, it
21 was getting the information in a way that you could verify the
22 existence or nonexistence of assets that the Clinches might
23 have; right?
24   A.   Yes.
25   Q.   And the discussion with Liberty Mutual was affidavits

96

1 because that was, in fact, the simplest way to do that?
2    A.   That was the vehicle that's usually used.
3    Q.   Correct.  And no other method of getting the
4 information was ever suggested to you by Liberty Mutual.
5    A.   Correct.
6    Q.   And when they asked you if you would amend your
7 affidavit after they told you the Clinches weren't going to
8 sign the one you sent, there's no way that you could make a
9 determination as to how to amend it without understanding what
10 was considered objectionable or not.
11   A.   Correct.
12   Q.   And of course, I think you answered this question,
13 but let me ask you in the context of a sequence of questions.
14       At no time did Liberty Mutual give you any specific
15 information as to what it was about your affidavit that the
16 Clinches found invasive or personal.
17   A.   Correct.
18   Q.   Even though on the day they sent you that May 26
19 letter, they actually had that information from their insureds
20 that their specific objection was related to providing the
21 social security numbers and the numbers of their bank
22 accounts —
23       MR. GUZZI:  Object to form.
24   Q.   — correct?
25   A.   Correct.

97

1    MR. RUBINOFF: That's all I have.
2    MR. GUZZI: I have a few more.
3    THE WITNESS: You said you were done.
4    MR. GUZZI: I was done before.
5              REDIRECT EXAMINATION
6 BY MR. GUZZI:
7    Q.   Turning to the June 16, 2004 letter -- you have that?
8 Mr. Rubinoff had just asked you about this, and I want to make
9 sure I understand what you're saying.
10   Now, when I asked you about this letter, my
11 understanding of your testimony was that your settlement
12 position at this point was that either the insureds had to
13 answer and execute the detailed affidavits or the other
14 alternative was that Liberty Mutual should tender the policy
15 limits without obtaining a release.  Is that an accurate
16 statement of your settlement position at this time?
17   A.   I think that's an accurate statement without getting
18 into semantics, yes.
19   Q.   Well, what do you mean by semantics because I'm
20 trying to ---
21   A.   Well, I think the context of the information is that
22 we need -- I think the whole thing here is very simple.  We
23 need to verify assets.  Now, if you're saying, oh, well, we
24 would have given you that information, but we're not going to
25 put it in an affidavit, we'll put it in another form that could

98

1 be verified and we said, oh, no, no, it has to say financial
2 affidavit on it, then no, that's not the context of the letter.
3 The context of the letter is that we need verification, and the
4 way it's normally done is through a financial affidavit.
5 BY MR. GUZZI:
6    Q.   Where in your letter does it say that?
7    A.   Where in the letter?
8    Q.   Yes.  Point to me the language where it says that.
9    A.   I think that the whole intent is to get the financial
10 asset information.
11   Q.   Okay.  Well, is there any specific language in here?
12   A.   I don't know how to make it any clearer.  I mean, to
13 me, I think it's pretty clear what our intent was all along.
14   Q.   Okay.  And the reason that I'm trying to clarify is
15 that I read this letter and it says, "If your insureds
16 still refuse to answer and execute the affidavits,"
17 referring to the affidavits, the detailed ones we've been
18 talking about, "then your company should tender the policy
19 limits without obtaining a release due to your insureds'
20 failure to follow your instruction."
21   MR. RUBINOFF: Yeah, but read in the beginning where
22 he talks —
23   MR. GUZZI: Ed, let me ask my question.
24   MR. RUBINOFF: Where they wouldn't tell him what they
25 objected to.

99

1    MR. GUZZI: You can ask him whatever you want when
2 it's your turn.  Let me ask my questions.
3    That's the language I'm referring to.
4    THE WITNESS: Okay.
5 BY MR. GUZZI:
6    Q.   So please enlighten me as to why my understanding of
7 your letter is wrong based on what I am reading out loud?
8    A.   Because it says, if you read the whole letter in
9 context, "It is unfortunate that your clients have chosen
10 not to answer the financial affidavits mailed.  You did not
11 specify which parts of the affidavit --"
12   So it's not that I'm concerned about the affidavit.
13 I'm concerned about all of the parts of the affidavit.  I want
14 the information.  That's the bottom line.  That's all I'm
15 saying.
16   Q.   Well, does your letter in here say anywhere, if your
17 insureds refuse to answer and execute the affidavits or if they
18 don't want to give me the information in some other format —
19 does it say anything like that?
20   A.   You know, what?  I didn't think about that in the
21 sense of what other format.  Should I say put it on legal
22 paper, instead of white paper?  I mean, basically, that wasn't
23 the issue.  The issue was verify information, not whether it
24 says affidavit as a title.
25   Q.   And how would you verify the information?

100

1    A.   Well, if they said to me, for instance, they would
2 send bank statements, verify those are the correct bank
3 statements.  I might accept those.
4    Q.   And how would you verify it?
5    A.   Allowing us to call the bank possibly or whatever
6 situation or we might get something from the bank that it is
7 correct.
8    Q.   Would you take an unsworn statement from them?
9    A.   I don't think I would -- I think I would require
10 something sworn, so that if someone gave a false statement
11 under oath, there would be grounds for punishment for that.
12   Q.   Okay.  So you are going to require some type of
13 affidavit?
14   A.   Something sworn to, yes.
15   Q.   Okay.  But as I understand your testimony now, the
16 settlement position is that this letter, yeah, it says what it
17 says, but what I really mean is I just need to make sure that I
18 get the asset information in some sort of form that I can
19 verify.  Am I understanding what your testimony is now?
20   MR. RUBINOFF: I think that's the testimony now and
21 throughout.
22   THE WITNESS: Yes.
23 BY MR. GUZZI:
24   Q.   Okay.  Is that your testimony?
25   A.   Yes.

---

101

1 Q. Well, then why didn't you write it like that?

2 A. You know, it's funny. I thought I did.

3 Q. Well, was there anything to stop you from saying

4 please have your insureds sign these affidavits or if they

5 don't want to, give me the information in some other format?

6 A. You know, I don't know how else to explain it. We

7 get back an affidavit which has no assets on it at all, with a

8 legal conclusion on it, nothing verified. I don't know how I

9 could respond to that, other than say, tell us what's wrong so

10 we can see what the real problem is, and then we don't get a

11 response. I mean, that's the basis of our letters.

12 Q. Did you ever call Brigitte Klein or anybody else at

13 Liberty Mutual and say, what's wrong with the affidavit?

14 A. At this point, we did everything by letter writing to

15 make sure.

16 Q. Did you ever call?

17 A. No.

18 Q. Why not?

19 A. Because I think at this point we wanted to make sure

20 our communication was clear.

21 Q. Well, I think one of your complaints is that Liberty

22 Mutual did not specify which parts the insureds found to be

23 improper; right?

24 A. Right.

25 Q. And either in this letter or at any other point;

---

102

1 right?

2 A. Right, I didn't get a response back from her from

3 that. Did I?

4 Q. Well, if this letter didn't satisfy what your

5 concerns were -- I mean, I'm sorry, if Ms. Klein's original

6 letter didn't satisfy your concerns and you didn't get a

7 response to this letter, why didn't you pick up the phone and

8 call?

9 A. Because we did everything in writing. I don't know

10 how much more you can make things clear.

11 Q. Why not write another letter that specifically says

12 look, you know, I just need this information, I don't care what

13 format it's in?

14 A. This is going on for several months. I don't know

15 how much more -- if we were here and I wrote four letters,

16 you'd say, why didn't you write five, and if there were five,

17 you'd say why didn't you write six.

18    MR. GUZZI: Off the record.

19    (Thereupon, a brief discussion was held off

20    the record, after which the following proceedings

21    were had.)

22    MR. GUZZI: Okay. Back on.

23 BY MR. GUZZI:

24 Q. Turning to Exhibit Number 8, which is the May 26,

25 2004 letter, now, I believe your testimony to Mr. Rubinoff was

---

103

1 that if Brigitte Klein had written in this letter as to

2 something more specific regarding the extremely personal

3 financial information, such as bank account numbers, social

4 security numbers, then you would have communicated back with

5 Liberty Mutual?

6 A. Absolutely.

7 Q. Okay. Now, what would you have communicated with

8 Liberty Mutual?

9 A. Well, I'd want to find out why he was concerned about

10 the bank numbers and why he was concerned about the social

11 security numbers, and depending on what his concerns are, we'd

12 try to address them.

13 Q. Okay. Well, your July 16 -- I'm sorry. Your June 16

14 letter that you wrote was in response to Ms. Klein's May 26,

15 2004 letter; right?

16 A. I believe so.

17 Q. And at this point, you understand based on

18 Ms. Klein's letter that the insureds found the affidavits that

19 you had proposed very invasive in their request for extremely

20 personal financial information; right?

21 A. Correct.

22 Q. Okay. So in this letter, you could have proposed any

23 type of solution that you wanted; right?

24 A. No, because I don't know what -- first of all, let's

25 look at it from my intent and my mind. Okay?

---

104

1    In the May 26 letter, it says, "Our insured finds

2    these affidavits very invasive in their request of

3    extremely personal financial information."

4    Well, okay, my first thought would be why would your

5 insureds think that these affidavits are very invasive if they

6 were sat down and spoken with and everything was explained to

7 them by the Liberty Mutual about what the nature of this whole

8 situation is? Second, what is extremely personal information

9 when you're just asking for asset information. Is asking how

10 much money you have in the bank account extreme, or how much

11 land you have? And then she says, "which has nothing do with

12 any assets." So for her to say that this has nothing to do

13 with the assets, I couldn't even -- to me, I thought I was

14 being stonewalled.

15 Q. Well, in your June 16 letter, Exhibit 9, you

16 specifically address the reference to the personal nature of

17 the information, don't you, at the very bottom of the letter?

18 A. Yes, we say the information requested in the

19 affidavit is of a personal nature because we're asking about

20 your personal assets.

21 Q. Okay.

22 A. But it's reasonable, but it's reasonable -- let me

23 finish what I wrote, "but it is reasonable under the

24 circumstances -- your insureds left Mrs. Maldonado without

25 a husband and three minor children without their father.

---

105

1    You do not want to know how Mrs. Maldonado feels about your
2    clients' objections to this inconvenience of providing
3    personal information after what your clients have done."
4    Q.   And so your response when Ms. Klein makes a comment
5    in her May 26 letter about the insureds are concerned about
6    being invasive and personal financial information, your
7    specific response to that specific complaint is that, yes, it's
8    of a personal nature but it's reasonable, and therefore, I
9    should get it; correct?
10   A.   Correct.
11   Q.   You don't propose if your insureds feel it's
12   personal, then maybe we can enter into a confidentiality
13   agreement; do you?
14   A.   I had no idea that that was even an issue.
15   Q.   Well, the letter right here says that they're not
16   signing it, because it's extremely personal information; right?
17   A.   If she would have sent me back a letter and said
18   we'll complete the affidavit, but the condition of the
19   affidavit is that it's confidential, in a heartbeat, we would
20   have accepted it.  What's the problem?
21   Q.   Did you ever propose that to Liberty Mutual?
22   A.   No, because I didn't think that that was the issue.
23   Q.   Well, the letter right there specifically tells you
24   that they have a concern about it being personal information;
25   right?

106

1        MR. RUBINOFF:  Objection, argumentative.
2        THE WITNESS:  No.
3    BY MR. GUZZI:
4    Q.   It doesn't?
5    A.   No, no, I'm saying it has nothing to do -- it says,
6    we're not giving this information.  There's a difference
7    between saying, I want to give this information, but I don't
8    want it to be disclosed to others as opposed to saying I'm not
9    giving you personal information.
10       You know, if I say to you -- if you go up to a lady
11   and say, I'd like to have your telephone number and she says,
12   I'll give it to you but I don't want you to give it to
13   Mr. Rubinoff, I can understand that; but if she says, I'm not
14   giving you any personal information about me, what does that
15   mean?  Because I'm going to be worried that she's going to
16   disclose it somebody else, or I'm thinking that she's going to
17   worry that I'm going to disclose it to someone else.  It didn't
18   come to my mind.
19   Q.   My question is, if I understand your testimony
20   correctly, if Ms. Klein had written in her letter that our
21   insureds find these affidavits very invasive in their request
22   of extremely personal financial numbers and they don't want
23   to give out their social security numbers and bank accounts,
24   then somehow you would have changed what you did?
25   A.   If they would have said that the reason that they

107

1    didn't want to give it out is that they were afraid it would
2    get into other people's hands or they were afraid that it would
3    go into a public record, then I'd say, well, I can rest assure
4    that I'm sure Liberty Mutual -- First of all, I'm sure Liberty
5    Mutual from experience of handling these claims knows or should
6    have told the client that all this stuff could be done
7    confidentially.  From past experience, I'm sure Liberty Mutual
8    knew that.  So if that was the issue, they would have simply
9    told their client that.
10   Q.   And what would your confidentiality agreement have
11   said?
12   A.   That we wouldn't disclose it to anybody, wouldn't be
13   a public record, whatever.  I mean, I don't know, because they
14   would be the ones requesting what they want.
15   Q.   On Exhibit 15, looking at Ms. Klein's notes that
16   we've been discussing, right up here, now, the note says,
17   "insureds advised they want numbers to all bank accounts
18   and social security numbers.  This is personal information,
19   not assets and will not return the form."
20       You see where I'm referring to?
21   A.   Yes.
22   Q.   Do you believe that that comment from the insureds is
23   inconsistent or incomplete with respect to what Ms. Klein
24   advised you in her letter?
25       MR. RUBINOFF:  You're talking about specifics in the

108

1    note versus the general comment in the letter?
2        THE WITNESS:  Yes, yes.
3    BY MR. GUZZI:
4    Q.   How are they inconsistent or is it inconsistent or is
5    it incomplete or both?
6    A.   It could be both.
7    Q.   Okay.  How so?
8    A.   Well, certainly incomplete, because you brought up
9    the point of confidentiality.  If that was an issue, that
10   certainly wasn't raised in her letter.  Anyway, just to read
11   this letter saying this information is invasive, what does that
12   have to do with confidentiality?  It says they don't want to
13   provide this information to us, not that we'd provide it to
14   some third party; and then the other thing is, it says that
15   insureds advised they want numbers to all bank accounts and
16   social security numbers, not assets.  How else could we verify
17   the assets that they're saying?
18       So I don't know.  There was never a discussion about
19   what other things or the ways that things could be verified;
20   but certainly, if the issue was confidentiality that would have
21   been a very easy thing to do which Liberty Mutual has probably
22   done on many occasions.  I don't know, but I would assume like
23   other insurance companies, they're very familiar with
24   confidentiality clauses and settlements and releases and other
25   things.

109

1  Q.  What do you think or what would you have liked for
2 this letter to say?
3     MR. RUBINOFF:  Object to the form.  I mean, he just
4 told you.
5     MR. GUZZI:  Ed, just let me ask him the question.
6     MR. RUBINOFF:  But how many times does he have to
7 tell you, if they give him specific information, they can
8 deal with it?
9     MR. GUZZI:  I'll ask as many times as I need until
10 I'm satisfied.
11    THE WITNESS:  First of all, I would expect that if
12 this was the issue, she should have written back and said,
13 dear Mr. Snyder, please be advised that my client has an
14 issue with giving bank account numbers and the social
15 security numbers for the following reasons.  Is there any
16 way that we could still give an affidavit and verify
17 things and still take care of the concerns of our
18 insureds?  Then we would have gone from there and
19 discussed back and forth what could be done and see what
20 they could send us and see what would satisfy us and what
21 we felt would be satisfactory in terms of not looking
22 silly in front of a judge for court approval.
23 BY MR. GUZZI:
24  Q.  So if Ms. Klein had a little bit -- let me understand
25 this.  If Ms. Klein had a little bit more detail as you've

110

1 expressed, then you would have communicated with Liberty Mutual
2 to say I'll enter into some sort of confidentiality agreement
3 or some other way to address your concerns; right?
4  A.  I have no problem entering into a confidentiality
5 agreement on an asset.  In fact, I don't think we ever -- I
6 mean, I don't think it's something that I would take somebody's
7 affidavit of financial assets and publish it in the Miami
8 Herald or do anything else like that.
9  Q.  And that would be in the hopes that if you enter into
10 some sort of confidentiality agreement, the Clinches would then
11 agree to sign the affidavits.
12  A.  If that was their concern.
13  Q.  Do you know whether that was their concern?
14  A.  I don't know what their concern was.  It was never
15 expressed to me.
16  Q.  Other than what Ms. Klein said in her letter.
17  A.  Other than what Ms. Klein said in her letter.
18  Q.  I believe you testified to Mr. Rubinoff, you made a
19 comment that you felt that there was no way for you to amend
20 the affidavit that you had submitted.
21  A.  I don't believe I made ---
22     MR. RUBINOFF:  No, he couldn't amend the affidavit
23 when he didn't know what he had to be amending for,
24 without information.
25     MR. GUZZI:  It was in the context of the May 26

111

1 letter and Ms. Klein said, if you're willing to amend the
2 affidavit in a way to address only the issues of personal
3 assets, et cetera.
4     THE WITNESS:  Right.
5 BY MR. GUZZI:
6  Q.  Do you see that?
7  A.  Yeah, but I have to know what they're talking about.
8  Q.  Right.
9  A.  Because I'm assuming -- here's what I'm assuming, I
10 don't think I'm unreasonable for assuming this, I'm giving an
11 affidavit.  The request starts off with tell me your assets,
12 right.  Tell me your assets.  And we get back an affidavit that
13 says, here's my affidavit and I'm not going to tell you my
14 assets and she says, will you take something less than -- less
15 than what?  Because I'm assuming, do I need to get bank account
16 information and real estate information and employment
17 information?  Yes.  So what less can I take?  Her affidavit is
18 saying we're not telling you what our assets are.  That's how I
19 interpret it.
20  Q.  Okay.  But Ms. Klein in her letter specifically tells
21 you that if you are willing to amend the affidavit in a way to
22 address only the issues of personal assets, then they'll
23 forward it to the insureds?
24  A.  Can I ask you a question?  If you look at the
25 affidavit that we sent, tell me what's not a personal asset?

112

1  Q.  My question is just confirming that you never sent
2 any type of amended affidavit.
3  A.  I never sent any amended affidavit.
4  Q.  And you never suggested to Liberty Mutual that you
5 would be willing to enter into a confidentiality agreement?
6  A.  And I never suggested that I would be -- what was
7 the --
8  Q.  Be willing.
9  A.  -- be willing to enter into a confidentiality
10 agreement.
11     MR. GUZZI:  Okay.  That's all I have.
12     MR. RUBINOFF:  Just a couple things.
13     MR. GUZZI:  Of course.
14         RECROSS-EXAMINATION
15 BY MR. RUBINOFF:
16  Q.  At the time that you were here, I mean, you
17 understood you had no fiduciary relationship with the Clinches;
18 correct?
19  A.  Correct.
20  Q.  Okay.  And you understood that you had no ability to
21 talk to the Clinches directly; correct?
22  A.  Correct.
23  Q.  So any communication regarding this matter had to
24 come from Liberty Mutual.
25  A.  Correct.

113

1 Q. Okay. Can you think of any reason why Ms. Klein
2 would not have given you in response to your requests the
3 specific concerns that the Clinches had that would have allowed
4 you to explore a resolution, that is, bank account numbers and
5 social security numbers?
6     MR. GUZZI: Object to form.
7     THE WITNESS: I can't think of a reason.
8 BY MR. RUBINOFF:
9 Q. Had you gotten that information, then as you
10 previously testified, you would have been in a position to
11 explore your need to verify the assets in a way that would meet
12 the concerns of the Clinches?
13 A. Correct.
14 Q. And there might have been any number of ways to do
15 that, but obviously, right now -- I mean, at that point in time
16 you're in a vacuum because you have no idea what the specific
17 concerns are and you have no idea in what way they can be
18 addressed.
19 A. Correct.
20     MR. RUBINOFF: Okay.
21         REDIRECT EXAMINATION
22 BY MR. GUZZI:
23 Q. All right. Now, if you had gotten an affidavit based
24 upon a confidentiality agreement and the affidavit said we have
25 some relatively small amount of assets and money, at that point

114

1 your settlement recommendation is going to be take the policy
2 limits and be done with it?
3     MR. RUBINOFF: Object, asked, answered, speculative
4 and don't answer it again. Let's get out of here. That's
5 it, brief answer.
6     THE WITNESS: Again, I would have to speak to my
7 client and see if there was something that the Clinches
8 would have come up with to resolve the matter, if that's
9 possible, and if it's not possible, you're right, if there
10 was nothing that they could get -- whatever could be
11 gotten would have cost my client more money than what they
12 would ultimately receive, I would recommend taking the
13 policy.
14     MR. GUZZI: Okay. That's it. Thank you.
15     MR. RUBINOFF: We'll read, and I'd like to be sure
16 that the exhibits are attached to the deposition, so that
17 when we make reference to them, when we read the
18 deposition and make reference to the exhibits, we've got
19 them right there.
20     MR. GUZZI: I'll order it with a mini and ASCII.
21     (Thereupon, the taking of the deposition was concluded
22 at 5:45 p.m.)
23
        EXCEPT FOR THE CORRECTIONS MADE
24      HEREIN ON THE ERRATA SHEET BY ME,
        I CERTIFY THIS IS A TRUE AND
25      ACCURATE TRANSCRIPT. FURTHER
        DEPONENT SAYETH NOT.

115

1
2
3              _____
                 Witness' name
4
5 STATE OF FLORIDA)
             ) SS:
6 COUNTY OF MIAMI-DADE)
7
   Sworn and subscribed to before me
8
   this _____ day of _____, 2007.
9
   PERSONALLY KNOWN _____ OR I.D. _____
10
11                    _____
12 Notary Public in and for the
   State of Florida at Large
13 My Commission Expires:
14
15
16
17
18
19
20
21
22
23
24
25

116

1              ERRATA SHEET
2    IN RE: Gabina Maldonado versus The First Liberty
                 Insurance Corporation
3  DEPO OF: BARRY M. SNYDER, ESQ.
      DO NOT WRITE ON TRANSCRIPT - ENTER ANY CHANGES HERE
4 Page-Line #    Change        Reason
5 _____|_____|_____
6 _____|_____|_____
7 _____|_____|_____
8 _____|_____|_____
9 _____|_____|_____
10 _____|_____|_____
11 _____|_____|_____
12 _____|_____|_____
13 _____|_____|_____
14 _____|_____|_____
15 _____|_____|_____
16 _____|_____|_____
17 STATE OF FLORIDA
18      ) SS
19 COUNTY OF MIAMI-DADE)
20    Under penalties of perjury, I declare that I have read
21 my deposition transcript, and it is true and correct subject to
22 any changes in form or substance entered here.
23
24    _____    _____
25  Date              Signature

**117**

1        CERTIFICATE OF OATH
2
3 STATE  OF  FLORIDA)
4              ) SS
5 COUNTY OF MIAMI-DADE)
6
7        I, the undersigned authority, certify that
8 BARRY M. SNYDER, ESQ. personally appeared before me and was
9 duly sworn.
10
11        WITNESS my hand and official seal this 3rd day of
12 October, 2007.
13
14
15
16            GILDA PASTOR-HERNANDEZ
17        Notary Public - State of Florida
18        Commission No. DD 663041
19        Commission Expires: June 25, 2011
20
21
22
23
24
25

**118**

1        REPORTER'S DEPOSITION CERTIFICATE
2
3 STATE  OF  FLORIDA)
4              ) SS
5 COUNTY OF MIAMI-DADE)
6        I, Gilda Pastor-Hernandez, Registered Professional
7 Reporter and Florida Professional Reporter hereby certify
8 that I was authorized to and did stenographically report the
9 deposition of BARRY M. SNYDER, ESQ.; that a review of the
10 transcript was requested; and that the transcript is a true
11 and correct record of my stenographic notes.
12    I further certify that I am not a relative, employee,
13 attorney or counsel of any of the parties, parties' attorney,
14 or counsel connected with the action, nor am I financially
15 interested in the action.
16        DATED this 3rd day of October, 2007.
17
18
19            GILDA PASTOR-HERNANDEZ
20
21
22
23
24
25

**119**

1
2
3
4 October 3rd, 2007
5
6 Kutner Rubinoff & Moss, P.A.
     Edward Rubinoff, Esq.
7 501 Northeast 1st Avenue
     Suite 300
8 Miami, Florida 33132
9 In Re: Gabina Maldonado
             vs.
10    The First Liberty Insurance Company
         Case No.:   07-20710
11    Depo Of:   BARRY M. SNYDER, ESQ.
         Taken On:   September 19, 2007
12
     Dear Mr. Rubinoff:
13
     Enclosed please find the deposition you ordered in the
14 above-referenced case.  Since reading and signing were not
     waived, and for the deponent's convenience, please arrange
15 for him to read and sign his deposition.  Should an Errata
     Sheet be filled out, please forward same to my attention
16 at Veritext Florida Reporting, 19 West Flagler Street,
     Suite 1020, Miami, Florida 33131.
17
     Your prompt attention to this matter is greatly
18 appreciated.
19 Sincerely,
20
21 _____
     Gilda Pastor-Hernandez, RPR, FPR
22 Court Reporter
23 cc: Gary J. Guzzi, Esq.
24
25